# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 29, 2015

Lyle W. Cayce
Clerk

————

13-10960

————

ROGER DALE TRENT; VICKIE DARLENE TRENT; RICHARD DALE TRENT; and RANDAL DEAN TRENT,

Plaintiffs–Appellees,

v.

STEVEN WADE and MATTHEW WALLING,

Defendants–Appellants.

————

Appeal from the United States District Court
for the Northern District of Texas

————

Before DAVIS, ELROD, and COSTA, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

We *sua sponte* withdraw the prior panel opinion, *Trent v. Wade*, No. 13-10960, 2015 WL 148989 (5th Cir. 2015) and substitute the following:

This appeal follows the district court's denial of the defendants–appellants' motion for summary judgment on qualified immunity grounds. The plaintiffs–appellees are members of the Trent family—father, mother, and two sons, in the order listed in the caption. At all times relevant, the defendants–appellants were police officers in Rowlett, Texas—Steven Wade a patrol officer and Matthew Walling the Chief of Police. The Trents filed a lawsuit pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, violations of their Fourth Amendment rights to be free from unreasonable searches and seizures. Particular to this appeal, the claims against Wade, in his individual capacity, involve a

No. 13-10960

nighttime vehicle chase that concluded with:  (1) Wade entering and searching the Trents' home without knocking and announcing his presence; and (2) Wade seizing and impounding the Trents' all-terrain vehicle ("ATV").  The claim against Walling is not premised upon his actions the night of the chase. Instead, the Trents allege that Walling, in his official capacity as a policymaker for Rowlett, is liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

The district court concluded that there were genuine issues of material fact as to Wade's entry into the Trents' house without knocking and announcing and denied Wade qualified immunity.  On appeal, Wade argues that the factual issues are not material because there is a *per se* hot pursuit exception to the knock and announce rule.  We disagree.  It is clearly established that there is no *per se* hot pursuit exception to the knock and announce rule.  Because the district court was correct in ruling that hot pursuit does not automatically excuse an officer from knocking and announcing, we affirm with respect to the knock-and-announce claim.  *See, e.g.*, *Juarez v. Aguilar*, 666 F.3d 325, 334 (5th Cir. 2011).   The district court also found genuine issues of fact with respect to the ATV seizure.  Because Wade did not violate clearly established law, even on the Trents' version of the facts, we reverse as to the ATV claim.  Finally, because qualified immunity is not at issue in the claim against Walling, we dismiss Walling's appeal for lack of jurisdiction.

**I.**

**A.**

The district court's thorough opinion describes the events giving rise to this litigation.  *See Trent v. Wade*, No. 3:12-CV-1244, slip op. at 1–7 (N.D. Tex.

2

No. 13-10960

Aug. 9, 2013). We recount the most pertinent facts here.[1] The record reflects that, several years prior to the night in question, some "friction" developed between the Trents and the police department in Rowlett. For example, Walling was a member of an association that attempted, via referendum, to obtain civil service status for the police department. Spearheading the effort to defeat the referendum was Roger Trent. Roger also was arrested for (but was never convicted of) stealing campaign signs associated with that referendum. Furthermore, Roger supported a particular mayoral candidate who, the Trents contend, was disfavored by the police department. In their complaint, the Trents allege that members of the police department, in response to Roger's political activism, engaged in "harassment and intimidation against the Trents, culminating in an illegal middle-of-the-night raid into their home." This alleged raid is the subject of the dispute on appeal.

One night in November 2011, at approximately 2:00 a.m., Wade was patrolling the President George Bush Turnpike in Rowlett.[2] Wade had received reports of criminal activity in the area. After seeing two ATVs racing southbound on the closed portion of the turnpike's northbound lane, Wade turned on his emergency lights in an attempt to make a traffic stop. One of the drivers (later identified as Richard Trent) steered past Wade's cruiser, turned into an open pasture, and accelerated off-road. Wade pursued the ATV. Less than one minute into the pursuit, Wade and Richard both arrived at the Trents' home. Richard parked the ATV under the porte cochere and ran to an exterior door of the home, which was several feet from the parked ATV. In

---

[1] Because this appeal arises from the denial of the officers' motion for summary judgment, we view the facts in the light most favorable to the nonmoving parties below, the Trents. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

[2] The camera in Wade's police cruiser captured a portion of the night's events on video.

3

No. 13-10960

turn, Wade pulled up and parked his cruiser within several feet of the ATV. Wade was familiar with the Trents' property (and was also aware of the "friction" between the Trents and the police department). As he ran through the door and into the home, Richard looked back at Wade. Wade testified that he did not see Richard throw out or pick up any potential evidence or any weapon.

Up to this point, for purposes of this appeal, no unconstitutional activity is alleged to have occurred. Then, approximately ten seconds after Richard ran into the home, Wade walked up to the house, opened the same door, and—without hesitation and without knocking or announcing his presence—stepped across the threshold of the Trents' home, forming the basis of the first of two claims against Wade at issue on appeal.

Upon entry into the home, Wade yelled: "Get out here." Wade also requested backup, relaying to the dispatcher: "I'm at Roger Trent's location." Still in the home, Wade again yelled for Richard to exit the residence: "Better get out here. Get out here." Wade testified that he heard several people moving upstairs. After standing inside the door for approximately ninety seconds, Wade went outside to meet the backup officers, who arrived in a matter of minutes. Wade then marched back into the home through the same door, gun drawn, and shouted back to the officers: "They're upstairs." Again, Wade did not knock and announce his presence. Two other officers followed behind through the same door; neither knocked or announced his presence.

Moving farther into the home, the officers encountered the other members of the Trent family. Wade and Roger had the following exchange:

Wade:      Get back. Get back. I got a felony in progress. Get back. You better get your a-- back. Back up.
Roger:     You pulled a gun on me.
Wade:      You bet I did. Get back.
Roger:     What do you want me to do? Go back to bed?

4

No. 13-10960

Wade:      No.  I want the kid that ran in the house.
Roger:     Yeah.  Well, who is that?
Wade:      You tell me.
Roger:     I just, you just woke me up.

After directing one of the other officers to "check under the bed," Wade repeatedly asked: "Where's the kid at?"  In response, Vickie Trent expressed confusion: "I really don't know what's going on."  Still failing to find Richard, Wade spoke again to one of the other officers: "Did you look under the beds and everything? . . .  Just check it again.  Sweep it."

Wade and the other officers soon discovered Richard inside the home. Richard was arrested for evading on a vehicle and taken out of the home. Simultaneously, Roger and Vickie attempted to explain that, as a "special child,"[3] Richard probably did not understand what was happening.  Wade warned Roger: "Back up or you're going to jail."  Wade also told Roger and Vickie: "Okay, I risked my life chasing him through the streets and over here."

After the arrest, Wade had the following exchange with the other officers:

Officer:   So you just f--king went in after (descriptive sound).
Wade:      I chased him through that field.
Officer:   Did you really? He left that door open, or what?
Wade:      No.
Officer:   Unlocked?
Wade:      Yeah.
Officer:   Who is this guy that we're supposed to know? He kept saying, You're supposed to know me.
Wade:      This is Roger Trent.
Officer:   He hates the police.
Wade:      He hates us.
Officer:   He hates the police, he hates the fire.
Officer:   He's big money, though, right?
Wade:      Yeah. Owns Hooters.
           . . . .

---

[3] Richard is in his early twenties and suffers from "mental retardation."

5

Wade:       Yeah, didn't you-all hear me say I was at Roger Trent's house?

Officer:    Yeah, I did.  I knew exactly who you were talking about as soon as I came over here.

Officer:    I was fixing to taze him when you were walking up to him and you had the gun pointed at him.

Roger approached the officers gathered outside the home, again attempting to explain that his son did not understand what he had done.  Wade dismissed that notion:  "Running from the police is a felony offense, which gives me a reason in a fresh pursuit to chase him inside the house and take him into custody."

Wade and the other officers then turned to the ATV and commenced with the actions that form the basis of the second claim at issue on appeal.  The officers conducted an exterior inspection of the ATV, removed some paneling, and looked through the interior compartments.  Wade ultimately had the ATV towed and impounded.

A grand jury "no billed" Richard on charges related to evading arrest that night in November.

**B.**

Based on the above-described facts and others, the Trents sued.  The Trents asserted § 1983 claims against Wade for: (1) an unconstitutional search, alleging that Wade entered the home without knocking and announcing his presence and searched the home without a warrant; (2) unconstitutional seizures, alleging that Wade seized Richard and the ATV without a warrant; and (3) First Amendment retaliation, alleging that Wade's actions were retaliation for Roger's political activism.  The Trents asserted one claim against Walling, alleging that, as the "final policymaker" for Rowlett, Walling implemented unconstitutional policies and failed to properly supervise his officers.  The defendants moved for summary judgment, and the district court

No. 13-10960

"confined summary judgment to the issue of qualified immunity."  At the same time, the district court "STAY[ED] discovery and summary judgment on the issue of sovereign immunity," explaining that sovereign immunity was relevant to the claim against Walling.

The district court granted in part and denied in part the defendants' motion for summary judgment on qualified immunity grounds.  Regarding the first claim, the district court granted the motion with respect to the warrantless search, reasoning that Wade was in "hot pursuit," but denied the motion with respect to the no-knock entry, concluding that genuine issues of material fact remained.  Regarding the second claim, the district court granted the motion with respect to the seizure of Richard but denied the motion with respect to the seizure of the ATV because genuine issues of material fact remained.  Regarding the third claim, the district court granted the motion.

The district court further concluded that the motion for summary judgment with respect to Walling was "premature," stating in a footnote:  "As the Court has stayed all discovery related to sovereign immunity, summary judgment in favor of Chief Walling is denied but may be re-urged after sufficient discovery on the issue of sovereign immunity."

Wade and Walling filed a single notice of interlocutory appeal, asserting that "the Court's order denie[d] Summary Judgment predicated upon Qualified Immunity."

## II.

A district court's denial of a motion for summary judgment on the basis of qualified immunity is immediately appealable under the collateral order doctrine, to the extent that the order turns on a matter of law.  *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).  Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

7

P. 56(a). "Whenever the district court denies an official's motion for summary judgment predicated upon qualified immunity, the district court can be thought of as making two distinct determinations, even if only implicitly. First, the district court decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law. Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct. According to the Supreme Court, as well as our own precedents, we lack jurisdiction to review conclusions of the *second* type on interlocutory appeal. Stated differently, in an interlocutory appeal we cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true." *Kinney v. Weaver*, 367 F.3d 337, 346–47 (5th Cir. 2004) (en banc) (internal quotation marks and citations omitted). Although we lack jurisdiction to resolve "the genuineness of any factual disputes," we have jurisdiction to determine "whether the factual disputes are material." *Kovacic*, 628 F.3d at 211 n.1. We thus review "the district court's legal determination of the materiality of the identified fact issues" *de novo*. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

A good-faith assertion of qualified immunity "alters the usual summary judgment burden of proof." *Id.* We draw all inferences in favor of the plaintiff (i.e., the nonmovant), but once a state official (i.e., the movant) asserts the defense, the burden shifts to the plaintiff to show that the defense is not available. *Kovacic*, 628 F.3d at 211. The plaintiff therefore bears the burden of showing a genuine and material dispute as to whether the official is entitled to qualified immunity. *Brown*, 623 F.3d at 253. "But, as explained above, in an interlocutory appeal we lack the power to review the district court's decision that a genuine factual dispute exists. Therefore, we do not apply the standard

No. 13-10960

of Rule 56 but instead consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney*, 367 F.3d at 348. "Where factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiffs' version of the facts as true." *Id*.

The doctrine of qualified immunity "insulate[s]" state officials from liability to the extent that the officials' actions do not violate "clearly established statutory or constitutional rights." *Kovacic*, 628 F.3d at 213 (internal quotation marks omitted). "The basic steps of our qualified-immunity inquiry are well-known: a plaintiff seeking to defeat qualified immunity must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). We have discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) ("[W]e begin in this case with the question whether the officers' conduct violated the Fourth Amendment. This approach, we believe, will be beneficial in developing constitutional precedent in an area that courts typically consider in cases in which the defendant asserts a qualified immunity defense." (alterations and internal quotation marks omitted)). In conducting the qualified immunity analysis, we "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866.

Within this framework, we address Wade's entitlement to qualified immunity *vel non* in Part III. We address the claim against Walling in Part IV.

9

No. 13-10960

## III.

The district court denied qualified immunity to Wade on the Trents' two Fourth Amendment claims.  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   As the text makes clear, "reasonableness" is "the ultimate touchstone of the Fourth Amendment." *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014) (internal quotation marks omitted); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985) ("[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable . . . ."); *Carroll v. United States*, 267 U.S. 132, 149 (1925) ("The Fourth Amendment is to be construed in light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens.").

We start with the claim based on Wade's failure to knock and announce his presence and then turn to the claim based on the seizure of the ATV.

### A.

There is no dispute that Wade neither knocked nor announced his presence prior to entering the Trents' home.  The district court concluded that there was a fact issue regarding whether Wade had a "reasonable suspicion of activity" that would justify dispensing with the knock-and-announce requirement.  In their brief, the defendants rely heavily on the "futility" justification, pointing to Richard's demonstrated unwillingness to comply with the law that night:  "Richard could have stopped at any point during the flight through the open field, but instead continued to demonstrate to Officer Wade that he would not comply with the lawful stop."  Thus, the defendants argue that "[a]ny additional attempt to gain compliance from the suspect under these circumstances would have been a useless gesture or senseless ceremony on the

No. 13-10960

part of Officer Wade."[4]     Arguing that there are fact issues that should be resolved at trial, the Trents urge us to affirm the district court's decision. However, as discussed, we lack jurisdiction to review the district court's determination that there were genuine issues of fact.   We may, however, consider Wade's legal argument that his hot pursuit excused him from the knock-and-announce requirement as a matter of law.

**1.**

It is axiomatic that what is reasonable depends on the circumstances, and the circumstances of a search and seizure carried out in a home necessarily include the officer's entry into the home.  Thus, as "the Framers of the Fourth Amendment" recognized, even where the authority to enter a home is not challenged, "the method of an officer's entry into a dwelling [i]s among the factors to be considered in assessing the reasonableness of a search or seizure." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).  Evaluating the reasonableness of the method of entry, moreover, "depend[s] in part on whether law enforcement officers announced their presence and authority prior to entry." *Id.* at 931.     The general rule therefore is that an officer must knock and announce his presence and authority prior to entering a home.

As with other aspects of Fourth Amendment law, the knock-and-announce rule is defined by its exceptions.  Building on *Wilson*, the Supreme Court announced in *Richards v. Wisconsin*: "[I]n each case, it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-

---

[4] In the briefing, the defendants use the terms "futility" and "useless gesture" interchangeably.  The Trents and the district court, at least in form, distinguish the terms. The word "futile" means "useless," and the Supreme Court, in the decisions discussed below, enumerated the futility justification without addressing or distinguishing the concept of useless gesture.  Accordingly, we view the two terms as one and the same.

announce requirement." 520 U.S. 385, 394 (1997); *see Wilson*, 514 U.S. at 934 ("The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests. . . . [T]he common-law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances."). The Supreme Court went on to explicitly identify several justifications for "dispensing with the knock-and-announce requirement":

> In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.

*Richards*, 520 U.S. at 394; *see also Hudson v. Michigan*, 547 U.S. 586, 589–90 (2006). Following *Richards*, we require officers to "at least articulate" the reasonable suspicion justifying the no-knock entry. *United States v. Cantu*, 230 F.3d 148, 152 (5th Cir. 2000); *see also Bishop v. Arcuri*, 674 F.3d 456, 466 (5th Cir. 2012) ("'[R]easonable suspicion' must be derived from specific facts and circumstance[s] surrounding a search."). The reasonableness of the officer's suspicion is evaluated as of the time of the entry. *Id.* at 461.

Explaining the knock-and-announce rule (including the justifications for dispensing with it), the Supreme Court in *Richards* reasoned that the rule "strikes the appropriate balance" between "law enforcement concerns" and "the individual privacy interests affected by no-knock entries." *Richards*, 520 U.S. at 394. The Supreme Court also identified those privacy interests that underlie the Fourth Amendment's knock-and-announce rule. In particular, individuals should have the opportunity to: (1) comply with the law and obey an officer's lawful demand to enter; (2) "avoid the destruction of property occasioned by a forcible entry"; and (3) "pull on clothes or get out of bed." *Id.* at 393 n.5; *see id.* ("[W]hen police enter a residence without announcing their

presence, the *residents* are not given any opportunity to prepare themselves for such an entry." (emphasis added)); *see also Wilson*, 514 U.S. at 931–33 (explaining the common-law history of the rule). The Seventh Circuit distilled these interests thus: "The core interest protected by the knock and announce requirement is therefore the receipt of notice by *occupants* of the dwelling sufficient to avoid the degree of intrusiveness attendant to a forcible entry as well as any potential property damage that may result." *United States v. Espinoza*, 256 F.3d 718, 727 (7th Cir. 2001) (emphasis added). The articulation of these privacy interests teaches that the futility justification, as announced in *Richards*, applies where the officer has a reasonable suspicion that it would be futile (or useless) to announce his presence because the occupants of the home to be searched are already on notice of his presence. Such prior notice—without a formal announcement from the officer—satisfies the privacy interests protected by the rule.[5]

The futility justification does not appear frequently in the case law, but the cases that do discuss the justification support our straightforward interpretation of the Supreme Court's decisions. We begin with several pre-*Wilson* cases that have applied a "useless gesture" exception in the context of 18 U.S.C. § 3109,[6] a longstanding federal law that generally requires federal officers to knock and announce their "authority and purpose" before forcibly

---

[5] We also note that "[c]ompliance is also a safeguard for the police themselves who might be mistaken for prowlers and be shot down by a fearful householder." *Miller*, 357 U.S. at 313 n.12.

[6] Under § 3109, when "execut[ing] a search warrant," an "officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, . . . if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

entering a home to execute a warrant.[7]   Our circuit addressed the useless gesture exception in *United States v. Seelig*, 498 F.2d 109 (5th Cir. 1974). There, we concluded that the exception to the "announcement-of-purpose provision" applied where officers carrying out a warrantless search[8] "were justified in being virtually certain that the *occupants* of the apartment [to be searched] would know the purpose of the visit as soon as the persons at the door identified themselves." *Id.* at 114 (emphasis added); *see also United States v. Metz*, 608 F.2d 147, 155 (5th Cir. 1979) ("[A]nnouncement is not necessary if it would serve no useful function.").   The Third Circuit has explained the useless gesture exception to § 3109 in similar terms. *See United States v. Kane*, 637 F.2d 974, 978 (3d Cir. 1981) (concluding that announcement is not required under § 3109 "when the *individuals* inside kn[o]w of the officers['] identity and purpose, thereby making an announcement a 'useless gesture.'" (emphasis added)).

Construing *Wilson* and *Richards*, other circuits have adopted formulations of the futility justification that are in accord with our circuit's formulation of a useless gesture.   For example, the Sixth Circuit has explained that "exigent circumstances relieve officers of the knock-and-announce requirement" when "the *persons* within the residence already know of the officers' authority and purpose." *United States v. Dice*, 200 F.3d 978, 983 (6th

---

[7] These cases do not apply the constitutional rule announced in *Wilson*, but they are nonetheless instructive:  Section 3109 codified the common law, and that same common law informed the Supreme Court's interpretation of the Fourth Amendment in *Wilson* and *Richards*.  *See United States v. Ramirez*, 523 U.S. 65, 73 (1998) ("[Section] 3109 includes an exigent circumstances exception and . . . the exception's applicability in a given instance is measured by the same standard we articulated in *Richards*.").

[8] Although the statute, by its terms, applies only to the execution of search warrants, the Supreme Court has held that "the validity of . . . an entry of a federal officer to effect an arrest without a warrant must be tested by criteria identical with those embodied in [§ 3109]." *Sabbath v. United States*, 391 U.S. 585, 588 (1968).

Cir. 2000) (emphasis added), *abrogated on other grounds by Hudson*, 547 U.S. 586; *see also United States v. Pelayo–Landero*, 285 F.3d 491, 499 (6th Cir. 2002) (citing *Dice* and reaffirming that the knock-and-announce rule is "unnecessary" if "the residence *occupants* know the officer's authority and purpose" (emphasis added)). Employing a similar interpretation of the futility justification, the Seventh Circuit reasoned that a warrantless, no-knock entry violated the knock-and-announce rule. *Green v. Butler*, 420 F.3d 689 (7th Cir. 2005). The court explained that, because the record reflected that the "*occupants* . . . did not know the identity of the officers," it therefore would not have been "reasonable for the agents to believe that, under the circumstances, knocking or announcing their identity and requesting permission to enter would have been a useless gesture." *Id.* at 697 (emphasis added); *see also Espinoza*, 256 F.3d at 727. The Second Circuit and Ninth Circuit are in agreement. *See United States v. Acosta*, 502 F.3d 54, 59 (2d Cir. 2007) (knocking and announcing not required "when an announcement by officers would be futile, as may occur when the circumstances indicate that the *inhabitants* are well aware of the officers' presence" (emphasis added)); *United States v. Peterson*, 353 F.3d 1045, 1049 (9th Cir. 2003) (concluding that a no-knock entry was justified as "futile" where the occupants of the residence were aware of the officers' presence because requiring the officers to "announce their presence . . . and wait some further period of time while the *occupants* reconsidered whether to admit or resist them . . . would amount to mandating a meaningless act" (emphasis added)).

Three key principles reveal themselves in the above discussion of the knock-and-announce rule generally and the futility justification specifically. First, the rule is not dependent on the officer's authority to search the home; otherwise, we would not have had the Supreme Court's decision in *Wilson*, which involved the execution of a warrant. The officer's authority to enter the

No. 13-10960

home—by virtue of a warrant or other exigent circumstances—is separate and apart from the "method of an officer's entry." *See Wilson*, 514 U.S. at 934.[9] Second, any no-knock entry, regardless of the officer's authority to enter the home, must be justified by a reasonable suspicion, under the circumstances, that knocking and announcing would be dangerous or futile or that it would inhibit effective investigation of the crime. *See Richards*, 520 U.S. at 394. Third, the rule contemplates that all of the occupants of a home possess the same constitutional rights—i.e., all of the occupants are entitled to be free from no-knock entries. The suspect is not the only one who is protected in his home, his "'castle of defense and asylum.'" *See Wilson*, 514 U.S. at 931 (quoting 3 William Blackstone, *Commentaries* 288). Those who live in the home enjoy that same protection.

"Futility" therefore justifies a no-knock entry only when the officer has a reasonable suspicion that the *occupants* of the residence to be searched are already aware of the officer's presence. The officer must be able to articulate this reasonable suspicion. This principle is the thread that runs from § 3109 and the Fifth Circuit's decision in *Seelig*, through the Supreme Court's decisions in *Wilson* and *Richards*. Indeed, given the interests protected by the knock-and-announce rule, this is the only reasonable interpretation of *Richards*'s enumeration of the justification.

---

[9] We recognize that both *Wilson* and *Richards* arose in the context of an officer's execution of a search warrant. This does not limit the knock-and-announce rule to only those scenarios, however. The rule is explicitly derived from the "reasonableness" requirement in the Fourth Amendment, and the Supreme Court has announced a number of categories of warrantless yet reasonable searches. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1083 (7th Cir. 2005) ("Because the knock and announce principle is a part of the reasonableness inquiry according to which any search is judged, it is relevant to searches conducted without a warrant under some recognized exigency, as well as those authorized in advance by a warrant."); *cf. Sabbath*, 391 U.S. at 588 (holding that the criteria in § 3109 apply to warrantless entries).

No. 13-10960

**2.**

We now turn to the first prong of the qualified immunity analysis: whether Wade violated the Constitution. *See Saucier v. Katz*, 533 U.S. at 200. The question here is whether, as a matter of law, knocking and announcing is futile when an officer is in hot pursuit of a suspect.[10] To answer this question, we begin with Wade's contention that the district court's conclusion that Wade was in "hot pursuit" justifies any violation of the rule. Citing *United States v. Santana*, 427 U.S. 38 (1978), Wade argues that, in the midst of a hot pursuit, a fleeing felon cannot retreat into his house to thwart an otherwise proper arrest. This is true, but only as far as it goes. *Santana* and the hot pursuit exception give an officer the extraordinary authority to carry out a warrantless search or seizure in the home. The knock-and-announce rule, on the other hand, is concerned not with the propriety of the search or arrest but rather, as explained above, the "method of an officer's entry." *Wilson*, 514 U.S. at 934. *Santana* (a pre-*Wilson* case) did not establish an exception to the knock-and-announce rule or even address the method of entry. More important, neither *Wilson* nor *Richards* invoked hot pursuit as a justification for a no-knock entry.

---

[10] In addition to "futility," the defendants argue on appeal that, from Wade's perspective, Richard "could have been going to get help, hiding evidence, going to get or hide a weapon, going to hurt the occupants, or any number of things." The defendants offer no further support for these arguments. None has merit. Starting with the end of the laundry list, "any number of things" is plainly insufficient. Second, there is *no* evidence in the record that Wade believed that Richard was going to hurt his own family. Third, there is also *no* evidence that Wade believed Richard was going to hide a weapon; in fact, Wade testified that he did not see any weapons on Richard. Fourth, there is *no* evidence that Wade believed that Richard was going to get a weapon, and, in any event, Wade's action suggest otherwise. Wade went inside and simply stood and yelled for ninety seconds. Fifth, there is *nothing* in the record indicating what evidence Richard might have been hiding. Sixth, there is *no* evidence that Wade believed that Richard was getting "help." It entirely unclear what sort of "help" Richard could have been seeking. Accordingly, the only legitimate justification offered is futility.

17

No. 13-10960

The Supreme Court made clear in *Richards* that, to justify a no-knock entry, an officer must have a reasonable suspicion that knocking and announcing would be dangerous or futile or that it would inhibit effective investigation of the crime. Hot pursuit itself may give the officer the authority to be inside a home without a warrant, but it does not have any bearing on the constitutionality of the manner in which he enters the home.[11] The entry itself is the point of the knock-and-announce rule. We conclude that hot pursuit—unless accompanied by one of the specific justifications enumerated in *Richards*—does not justify a no-knock entry. Wade points to no authority to the contrary. The fact that the pursued in a hot pursuit is aware of the officer's presence says nothing, without more, about the awareness of the other occupants of the home, all of whom are protected by the knock-and-announce rule. Therefore, the mere fact that the district court upheld the constitutionality of Wade's search of the Trents' home as one carried out in hot pursuit does not justify Wade's failure to knock and announce.

Because no blanket hot pursuit justification exists, Wade must be able to articulate his reasonable suspicion that the occupants of the Trents' home were already aware of his presence before he opened the door and walked in unannounced. At the summary judgment stage, the Trents were required to demonstrate genuine issues of material fact about whether such reasonable

---

[11] As a practical matter, the reason for the hot pursuit may also serve to justify a no-knock entry: For example, when an armed and dangerous suspect flees into his house in a hot pursuit, stopping to knock and announce might be a dangerous course of action for an officer. Thus, what is sufficient to establish hot pursuit may sometimes—*but not always*—be sufficient to justify a no-knock entry. *See, e.g.*, *Ingram v. City of Columbus*, 185 F.3d 579, 589 (6th Cir. 1999) ("[T]he fact that [the defendants] were in 'hot pursuit' of [the plaintiff] does not, without further justification, prove that knocking and announcing would have been dangerous or futile, or would have prevented effective investigation of the crime. Moreover, we decline [the defendants'] implicit invitation to ignore these clearly delineated exceptions to the knock and announce rule and to adopt the 'hot pursuit' justification as a per se exception to the knock and announce requirement.").

suspicion existed. *See Brown*, 623 F.3d at 253. The district court concluded that the Trents met their burden, and we lack jurisdiction to review the district court's decision on that issue.

Although the facts here demonstrate that Richard was aware of Wade's presence and authority, the summary judgment record reflects a fact issue as to whether Wade knew or should have known that the whole Trent family was in the house. As Wade testified, as soon as he walked into the house, he heard others moving upstairs, and he told the backup officers that "they" were upstairs. Furthermore, the record reflects a fact issue as to whether, in the time between Wade's arrival at the Trents' home and his no-knock entry (a matter of seconds), Wade developed a reasonable suspicion that the other occupants of the home, at 2:00 a.m., were awake and aware of his authority and purpose. The district court concluded that a genuine issue of material fact exists as to whether "a reasonable officer would have taken into account that other residents could have been asleep at 2:00 a.m.," a circumstance that would necessitate "some manner of forewarning prior to entry." As the district court found, "the residents appeared to be awaken[ed] not from Richard entering the house, but rather from Wade's entry and movement to the stairs." In light of the foregoing discussion, we conclude that these fact issues are material to the question of whether Wade is entitled to qualified immunity.

**3.**

The second prong of the qualified immunity analysis requires us to decide whether the knock-and-announce rule—i.e., the Trents' right to be free from a no-knock entry—is "clearly established." *See Saucier v. Katz*, 533 U.S. at 200. A right is clearly established only if "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023. A case directly on point is not required; rather, "[t]he central concept is that of 'fair

19

warning': The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

As explained above, *Wilson* and *Richards* placed the knock-and-announce rule and the justifications for dispensing with it beyond debate. With respect to the justifications, any reasonable officer would know that he was violating the rule if he did not have reasonable suspicion that knocking and announcing would be dangerous or futile or that it would inhibit effective investigation of the crime. *Plumhoff*, 134 S. Ct. at 2023. The rule and the justifications are therefore clearly established.[12] Any reasonable officer would understand that, because the knock-and-announce rule serves to alert the occupants of a home of an impending lawful intrusion, the futility justification requires reasonable suspicion that the occupants of the home to be searched are already aware of the officer's presence. The Fifth Circuit's decision in *Seelig* and the Supreme Court's decisions in *Wilson* and *Richards* gave Wade the "fair warning" that the law requires. *See Roe*, 299 F.3d at 409. Although

---

[12] The defendants contend that, because neither the Fifth Circuit nor the Supreme has discussed "hot pursuit" vis-à-vis the knock-and-announce rule, the cases from the Fifth Circuit and the Supreme Court "simply cannot stand for the proposition that there is no blanket hot pursuit exception." As a result, the defendants argue, the law is not clearly established with respect to knocking and announcing when in hot pursuit. Under their approach, in the Fourth Amendment context, if a prior case has not explicitly rejected an officer's proposed justification for his actions, the officer, by default, would be entitled to qualified immunity. We do not follow that approach. Instead, we view the knock-and-announce rule as *the rule* and the justifications as *the justifications*. An officer does not act reasonably when he blatantly disregards the rule without an accepted justification. *Cf. Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) ("Time and again, [the Supreme] Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and *well delineated exceptions*." (emphasis added) (internal quotation marks omitted)).

the law in our circuit is not flush with cases explaining specific circumstances in which officers were or were not entitled to rely on the futility justification, the knock-and-announce rule and its accompanying reasonable suspicion requirement are clear.

In light of the materiality of the genuine issues of fact regarding whether Wade violated clearly established Fourth Amendment rights when he entered the Trents' home without knocking or announcing his presence, the district court was correct to deny qualified immunity on this ground. The remaining fact issues must be resolved at trial.

**4.**

Wade also argues that he is entitled to qualified immunity because his actions were "objectively reasonable." However, "objective reasonableness" is not a separate prong in the qualified immunity analysis. As discussed, the qualified immunity analysis involves two inquiries: (1) whether the official violated a statutory or constitutional right and (2) whether that the right was clearly established. *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc). The analysis does not allow us to examine the "objective reasonableness" of an officer's action without reference to clearly established law. Accordingly, Wade is not entitled to qualified immunity on the ground that his actions were "objectively reasonable."

**B.**

We now address whether Wade is entitled to qualified immunity with respect to his warrantless seizure of the ATV. We again lack jurisdiction to review any factual disputes and resolve only the questions of law. The first prong of the qualified immunity inquiry is whether the officer's conduct violated the Constitution. As discussed, the touchstone of the Fourth Amendment is reasonableness. Several facts suggest that the seizure of the ATV was unreasonable. As the district court explained:

> [T]he police officers did a thorough exterior search of the ATV and even physically removed internal compartments following this examination. This search revealed nothing to spur greater curiosity. Concerns of spoliation and gathering fruits of the offense (beyond perhaps the ATV itself) become tenuous. For the crime of evading arrest in this factual context, there was no evidentiary gain from riding the ATV off the premises only to rendezvous with a tow truck. Similarly, Wade fails to present any evidence to suggest that he had anything but unparticularized suspicion that the impound may achieve some measure of evidentiary worth.

Although we understand the district court's concerns with the seizure in these circumstances, we need not decide this constitutional question because we conclude that the seizure did not violate clearly established law.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The constitutional question in this case falls short of that threshold. No Supreme Court or Fifth Circuit case directly addresses whether police may effectuate a warrantless seizure of a vehicle under the circumstances present in this case, and the two lines of cases most relevant to the question do not clearly establish that Wade's conduct violated the Fourth Amendment.

The first line of cases involves warrantless searches and seizures of automobiles that are designated as contraband by state law. The first in this line of cases was *Carroll v. United States*, 267 U.S. 132 (1925), in which the Supreme Court held that federal officers with probable cause to believe that an automobile contains contraband may search the car and seize the contraband without obtaining a warrant. *Id.* at 149. The Court based its conclusion on, *inter alia*, early federal laws that authorized federal officers to

No. 13-10960

conduct warrantless searches of ships and to seize concealed goods subject to duties. *See id.* at 150–51. Based on those early laws, the Court drew a distinction between "a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Id.* at 153.

The Court extended *Carroll*'s reach in *Florida v. White*, 526 U.S. 559 (1999). *White* presented the question of whether *Carroll*'s rule also permitted the seizure of an automobile if police have probable cause to believe that the automobile itself is contraband. Under Florida law, any vehicle used as an instrumentality in the commission of a felony was designated as forfeitable contraband. After police officers observed a vehicle being used to deliver cocaine, they effected a warrantless seizure of the vehicle from a public parking lot. Relying on *Carroll*, the Court upheld the search, holding that officers may seize an automobile if officers have "probable cause to believe that the vehicle *itself* was contraband under [state] law." *Id.* at 565. The Court reasoned that law enforcement's "need to seize readily movable contraband before it is spirited away . . . is equally weighty when the *automobile*, as opposed to its contents, is the contraband that the police seek to secure." *Id.* The Court also found relevant that the vehicle was seized from a public parking lot: "our Fourth Amendment jurisprudence has consistently accorded law enforcement officials greater latitude in exercising their duties in public places." *Id.* at 565.

The facts of the present case are in line with those of *White*, save for one detail. As in *White*, the police officer observed the ATV being used in the commission of a felony (evading arrest). As in *White*, state law designates as contraband property "used in the commission of . . . any [specified] felony" and

23

permits police to seize that "contraband."   Tex. Code Crim. P. art. 59.01(2)(A)(ii); *id.* art. 59.02(a).   However, unlike *White*, police in this case seized the vehicle from the porte cochere of the Trents' property, not from a public parking lot.

Notwithstanding this important distinction, Wade was entitled to rely on *White* in effectuating the seizure of the ATV.  As noted, neither party has identified a Supreme Court or Fifth Circuit case addressing whether police may effect a warrantless seizure of a vehicle as contraband when that vehicle is located on private, rather than public, property.  Thus, *White* appears to be the most on-point precedent, and it permitted a similar seizure.  Although the Court in *White* supported its holding by noting that the vehicle was seized from public property, the Court did not say that the seizure was permissible *only* because the vehicle was located on public property.  In fact, the bulk of the analysis in *White* centered on *Carroll* and the "special considerations recognized in the context of movable items."  *White*, 526 U.S. at 565.  Those "special considerations" apply regardless of whether a vehicle is located on public or private property.   Moreover, several courts of appeals have interpreted *Carroll* to permit the warrantless search of an automobile located on a private driveway.  *See, e.g.*, *United States v. Blaylock*, 535 F.3d 922, 925–27 (8th Cir. 2008); *United States v. Hines*, 449 F.3d 808, 813–15 (7th Cir. 2006); *United States v. Brookins*, 345 F.3d 231, 237 (4th Cir. 2003); *United States v. Hatley*, 15 F.3d 856, 858–59 (9th Cir. 1994).  Thus, it remains an open question whether the Fourth Amendment permits the warrantless seizure of a vehicle from private property when state law designates that vehicle as forfeitable contraband.  *See al-Kidd*, 131 S. Ct. at 2085 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.").

No. 13-10960

Even if *White* clearly established a public/private distinction, the facts of this case do not clearly fall on the "private" side. In its discussion of the "public" factor in *White*, the Court stressed that "the warrantless seizure also did not involve any invasion of respondent's privacy." *Id.* at 566. The warrantless seizure in this case also did not involve any invasion of the Trents' privacy because police were lawfully present on the Trents' property as they pursued a suspect who was evading arrest. Thus, the porte cochere was not "private" in the same sense as would be private property to which officers had no lawful access. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.3(b) (4th ed. 2004) ("[I]t would appear that the Court is also accepting as controlling in forfeiture cases . . . that this power of warrantless seizure . . . does not extend to vehicles situated on private premises *to which access is not otherwise available for the seizing officer*." (emphasis added) (internal quotation marks omitted)).

Indeed, Wade's lawful presence on the property implicates a separate line of cases on which Wade was also entitled to rely in effecting the seizure. Supreme Court precedent permits officers to seize contraband in plain view so long as its incriminating character is "immediately apparent" and the officers are "lawfully located in a place from which the object can be plainly seen . . . ." *Horton v. California*, 496 U.S. 128, 136–37 (1990) (internal quotation marks omitted). Thus, officers executing a valid warrant to search for stolen jewelry may also seize weapons they discover if the incriminating nature of the weapons is readily apparent. *Id.* at 142; *see also Warden v. Hayden*, 387 U.S. 294 (1967) (holding that police may seize evidence they observe while inside a house in hot pursuit of a suspect). Wade was lawfully on the Trents' property when he observed the ATV, which had just been used as an instrumentality in the crime of evading arrest. Under these circumstances, Wade did not violate clearly established law by effecting a seizure of the automobile. *Cf. United*

25

*States v. Sanchez*, 612 F.3d 1, 5 (1st Cir. 2010) (relying on the plain-view doctrine to uphold a warrantless seizure of an unlicensed motorcycle from "a parking lot where [officers] had a right to be, and both the motorcycle and its license plate were easily visible to the naked eye.").

The district court denied qualified immunity because Wade had not shown that "any public caretaking concern is served by impounding an ATV parked outside of a private residence." As a result, the district court opined that fact issues precluded a finding that the seizure was reasonable. We might agree that no public caretaking concern was served by seizing the vehicle, but public caretaking is just one ground upon which officers may seize a vehicle.[13] As the above discussion makes clear, vehicles also may be seized if they are contraband subject to forfeiture under state law or if they are contraband in plain view of an officer. *See Sanchez*, 612 F.3d at 3–4 (upholding seizure under plain-view doctrine instead of addressing parties' arguments about community caretaking). Thus, the fact dispute identified by the district court is immaterial.[14]

Because Texas law allowed Wade to seize the ATV, and because Wade was lawfully present on the Trents' property when he effected the seizure, Wade did not violate clearly established law when he seized the ATV. Put

---

[13] Public caretaking typically applies when the owner of the vehicle has been arrested while the vehicle is on the public streets. In that situation, the public caretaking exception to the warrant requirement allows police to impound the vehicle to protect the vehicle, its contents, and the surrounding roadways. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.3(c) (4th ed. 2004).

[14] The district court also found that the seizure of the ATV was not reasonable because officers had already searched it and it thus had no evidentiary value. However, *White* did not clearly establish that seizures of automobiles are only permissible if the automobile has evidentiary value. *See White*, 526 U.S. at 571 (Stevens, J., dissenting) (criticizing majority opinion because "no serious fear for officer safety or loss of evidence can be asserted in this case . . . .").

differently, Wade did not have "fair warning" that neither *White* nor the plain-view doctrine would permit seizure of the ATV. Accordingly, Wade is entitled to qualified immunity with respect to the seizure of the ATV.[15]

## IV.

We now turn to Walling. Because we have concerns regarding our appellate jurisdiction over Walling, we *sua sponte* examine the basis of that jurisdiction, which the defendants appear to presume. *See Mosley v. Cozby*, 813 F.2d 659, 660 (5th Cir. 1987).

The first issue concerns the district court's order itself. The defendants filed their notice of interlocutory appeal together, asserting that "the Court's order denie[d] Summary Judgment predicated upon Qualified Immunity." It is clear that, with respect to Wade, that is true. Whether the district did so with respect to Walling, however, is not clear. The district conditioned its ruling: "[S]ummary judgment in favor of Chief [of Police Matthew] Walling is denied but may be re-urged after sufficient discovery on the issue of sovereign immunity."[16] Moreover, according to the district court, the defendants had moved for summary judgment on qualified immunity grounds, arguing, as to Walling, only that Walling is not the "final policymaker." But the district court did not rule on whether Walling was a "final policymaker" in its opinion. Further complicating this issue, the defendants' brief states that the district

---

[15] We note that we are not persuaded by the Trents' admonition that, if Wade's actions were legal, every failure to use a turn signal would authorize seizure of the vehicle. Texas law only designates as contraband automobiles used in the commission of felonies. Needless to say, failure to use a turn signal is not a felony.

[16] Although it appears to us that the district court merely misused the phrase "sovereign immunity" instead of the phrase "municipal liability," we note that sovereign immunity has no place in this case. *Cf. Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) ("We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent."); *id.* at n.7 ("[B]y the time of the enactment of § 1983, municipalities no longer retained the sovereign immunity they had previously shared with the States.").

court "did not rule on qualified immunity" for Walling.  Yet the defendants also ask us to reverse the district court and grant qualified immunity to Walling. We therefore have doubts about whether the district court actually ruled on Walling's entitlement to qualified immunity such that we may exercise appellate jurisdiction.

More fundamental to this case is the fact that qualified immunity was not, and is not, at issue in the claims against Walling.  As the district court observed, the Trents allege, in the only claim directed against Walling (Count Four), that Walling is liable as the "final policymaker" for the Rowlett police department.    The  Trents  further  allege  that  Walling  implemented unconstitutional policies and failed to properly supervise his officers.  These allegations demonstrate that the Trents sued Walling in his official capacity, not in his individual capacity.  The Trents' theory of liability therefore plainly is grounded in municipal liability.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (analyzing  lawsuit  against  "Harry  Connick,  in  his  official  capacity  as  the Orleans Parish District Attorney," under municipal liability principles).[17]

It  is  well  established  that  "municipalities  have  no  immunity  from damages liability flowing from their constitutional violations." *Owen v. City of Independence*, 445 U.S. 622, 657 (1980); *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) ("Unlike government officials sued in their individual capacities, municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under § 1983."); *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 759 (5th Cir. 1993) ("While qualified  immunity  shields  a  city's  officers  from  damages  caused  by  their

---

[17] The Trents also acknowledge in their brief that they "sued Walling only in his official capacity, not individually, which is equivalent to a suit against the government entity itself."

transgression of rights not 'clearly established' at the time of their conduct, the city itself is 'strictly liable' for all constitutional violations committed pursuant to its policies." (citations omitted)).  As a result, the relevant questions with respect to Walling's liability are:  (1) whether Walling's actions amounted to an "official municipal policy" and (2) whether those actions caused the Trents' injury.  *Thompson*, 131 S. Ct. at 1359.  Walling may not be insulated by qualified immunity.

Because qualified immunity is not at issue, we may not exercise appellate jurisdiction over Walling.  Qualified immunity is the reason this case is before us on interlocutory appeal.  The Supreme Court has elaborated on the collateral order doctrine:

> When we placed within the collateral order doctrine decisions denying pleas of government officials for qualified immunity, we stressed that an official's qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."

*Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Thus, under circumstances like these, where there is no qualified immunity to be denied, there is no collateral order to be properly appealed.  Walling is either liable or not liable under *Monell*; qualified immunity does provide a way out.  Accordingly, the proper course is a dismissal of the appeal, with respect to Walling only, for lack of jurisdiction.  *See Burge*, 187 F.3d at 477 ("Because an erroneous ruling on liability may be reviewed effectively on appeal from final judgment, the order denying the

No. 13-10960

[alleged municipal policymaker's] summary judgment motion in this 'official capacity' suit was not an appealable collateral order.").[18]

## V.

We AFFIRM the denial of Wade's summary judgment motion as to the Trents' claim against Wade for his entry into the Trents' house without knocking and announcing.  We REVERSE the district court and RENDER judgment in favor of Wade as to the Trents' claim against Wade for the seizure of the ATV, and DISMISS Walling's appeal of the denial of his summary judgment motion.

---

[18] The Trents also filed a motion to supplement the record on appeal, seeking to supplement the record with various e-mails exchanged between counsel regarding Walling and the decision not to take Walling's deposition due to the district court's order staying discovery on sovereign immunity.  Because we dismiss the appeal with respect to Walling, the motion is MOOT.