# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20783

United States Court of Appeals
Fifth Circuit

**FILED**
February 1, 2018

Lyle W. Cayce
Clerk

BARBARA ANN THOMAS; JOHN THOMAS,

      Plaintiffs - Appellants

v.

J. J. WILLIAMS,

      Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:14-CV-2711

Before BARKSDALE, DENNIS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT:*

This is an appeal from a district court order denying Barbara Ann Thomas and John Thomas's motion for summary judgment on their 42 U.S.C. § 1983 claim against a police officer from the Houston Police Department ("HPD") and granting summary judgment in favor of the HPD officer.

Barbara Ann Thomas and her son, John Thomas, reside at 5816 Hirsch Road, in Houston, Texas. The appellee, J.J. Williams, is a Senior Officer in

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-20783

HPD's narcotics division. As Williams asserted in his affidavit submitted in support of his cross-motion for summary judgment, on April 21, 2014, he began investigating claims of drug activity on the 5800 block of Hirsch Road. The initial information Williams received was that drugs were being sold from "5814 1/" Hirsch Road. A complaint from April 30, 2014 informed of drug activity at 5814 Hirsch Road. HPD also had an email from the Mayor's office, which included the following information:

> Black truck on the street that drug dealers sleep in is used to deal drugs. Drugs are being dealt to school kids and around school kids. Dealers are threatening neighbors and damaging property. 5800 Hirsch Rd. is the block number, and the house that some of the drug dealers live in is 5814 ½ Hirsch Rd. . . .

On May 7, 2014, Williams and a fellow officer took a confidential informant ("C.I.") to the location to attempt a narcotics purchase. During the operation, the officers "maintained distant and rolling surveillance, so not to be 'picked off' by any 'look outs,'" which had happened during a previous narcotics purchase attempt in the complex. The C.I. was sent to look for the apartment numbered 5814 ½ and returned having successfully purchased crack cocaine from a "black male on the porch." The C.I. informed the officers that he did not observe the black male coming out of or going into the apartment to get the narcotics. This is referred to as a "dirty buy," and "a search warrant cannot be generated under these circumstances because there is no proof the crack came out of the apartment." After further investigation, the officers identified a suspect named "Nash" as the seller. Williams continued surveilling the apartment complex and noticed that the suspect, Nash, was always in common areas of the complex; Williams concluded that Nash did not normally sell his narcotics from inside an apartment where he presumably kept the bulk of his narcotics. This was apparently common practice because

2

it made it especially difficult for police officers to recover evidence and arrest dealers while in possession.

On May 20, 2014, Williams and another officer returned to the complex with the same C.I. The officers again maintained "a distant and rolling surveillance," which obstructed the officers' view of the buy. The C.I. returned with 0.19 grams of crack cocaine and told the officers that he or she observed Nash come out of his apartment. The C.I. said that the address above the door was 5-8-1-8. The officers also obtained information about the specific location of the suspect's apartment door. Lastly, Williams drew a diagram of the apartment complex, and the C.I. indicated exactly where the suspect entered the apartment. The C.I. indicated that the relevant building was in the far southeast corner of the complex and that Nash used the door on the right, "as far in the corner of the complex as you can go." In his deposition, Williams testified that he did not walk through the complex to verify the numerical address himself because he did not want to alert anyone to their investigation. Given that the residents were predominantly black, he was worried that, as a white man, he would stand out.

Based on the information, his experience, and prior dealings with this same C.I., Williams prepared a probable cause affidavit and search warrant for 5818 Hirsh Road, and a local judge signed it. The warrant stated that 5818 Hirsch Road was located "in the far southeast corner of the location," and it included a photo of the duplexes in the 5800 block of Hirsch. On May 24, 2014, Williams and other officers executed the search warrant. According to Williams's affidavit submitted in support of his cross-motion for summary judgment, when the officers approached the apartment described by the C.I., he noticed that the address was "5816" instead of "5818." Williams decided that the C.I. must have just misread the number and that, in his experience, this mistake was generally unintentional and immaterial. Indeed, Williams also

stated that the apartment's location was accurately described by his "long-time reliable and trustworthy C.I."

Before entering, the officers announced, "POLICE SEARCH WARRANT!" and pounded on the outside of the burglar bars. The police pried open the burglar bars, and "[a]lmost simultaneously, Ms. Thomas opened her door and stepped back." The officers immediately performed a "security sweep" to ensure there were no threats to the officers' safety; this sweep is not an "actual search." During the safety sweep, it became apparent that the apartment was not being used to sell or store drugs. Williams asked Ms. Thomas a few questions to determine whether it was possible someone else had a key to her apartment and could be using it without her knowledge. Williams also informed Ms. Thomas that they had a search warrant for her apartment and that was why the officers were present; she replied that the officers could "[g]o ahead and look."

When Ms. Thomas asked Williams who he was looking for, he informed her they were looking for a suspect described as "a young black male[,] 18-20 years old, who likes to wear a red shirt and goes by the nickname of 'Little Black.'" Ms. Thomas's eyes "lit up," and she responded that she knew who Williams was talking about. She informed Williams that "Little Black" used to live at 5814 ½ Hirsch Road, but that he had just moved to the apartment next door to hers, 5816 ½. Before exiting the Thomases' apartment, Williams gave Ms. Thomas his work phone number so that she could call him if she needed anything or saw suspicious activity.[1]

A few days later, Williams spoke with the C.I. and showed the C.I. the vantage point from which the Thomases' door was visible. The C.I. realized he

---

[1] Indeed, the next day Ms. Thomas called Williams to report a possible robbery; she described the suspects and gave Williams information about the suspects' car and its license plate number.

did not see the Thomases' door because "the brick wall that runs partially between the two apartments blocked [the C.I.'s] view of Ms. Thomas's door." The C.I. was genuinely remorseful and upset because of his or her unintentional error.

The Thomases brought this § 1983 suit in federal district court against Williams and others, claiming that the defendants violated their Fourth Amendment right to remain free from unreasonable searches and seizures. The plaintiffs filed a motion for summary judgment against only Williams, and Williams filed a cross-motion for summary judgment asserting qualified immunity. The district court granted summary judgment in favor of Williams on the basis of qualified immunity, dismissing only the claims against him pursuant to Federal Rule of Civil Procedure 54(b). The Thomases moved for reconsideration, and the district court denied the motion. The Thomases timely appeal the grant of summary judgment and the denial of their motion for reconsideration.

**I**

This court reviews "the district court's summary judgment decision *de novo*, using the same standard as the district court." *Roberts v. City of Shreveport*, 397 F.3d 287, 291 (5th Cir. 2005). Summary judgment is appropriate if the record discloses "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 856 (5th Cir. 2014).

The qualified immunity doctrine "immunizes government officials from damages suits unless their conduct has violated a clearly established right." *Tolan v. Cotton*, 134 S. Ct. 1861, 1864 (2014). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Id.* at 1865.

> The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right. . . .

> The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation. Governmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional.

*Id.* at 1865–66 (cleaned up). Notwithstanding the general principle that this court must view the evidence in the light most favorable to the nonmoving party, the plaintiffs still bear the burden to show that Williams is not entitled to qualified immunity. *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

## II

The Thomases first argue that Williams is liable under *Franks v. Delaware*, 438 U.S. 154 (1978), because he knowingly made material misrepresentations in his probable cause affidavit. In *Franks*, the Supreme Court "established that an officer is liable for swearing to false information in an affidavit in support of a search warrant, provided that: (1) the affiant knew the information was false or [acted with] reckless disregard for the truth; and (2) the warrant would not establish probable cause without the false information." *Hart v. O'Brien*, 127 F.3d 424, 442 (5th Cir. 1997) (citing *Franks*,

438 U.S. at 171). An officer who is merely negligent or who makes an innocent mistake will not be held liable. *Id.*

The relevant portion of Williams's affidavit in support of a search warrant provides:

> After developing a tactical plan the officers with the C.I. proceeded to 5818 Hirsch. Prior to doing so, your affiant checked the C.I. for any contraband, after none were found, supplied the C.I. with an amount of city buy money. The C.I. was then directed to the listed location to purchase an amount of Crack Cocaine. Your affiant observed the C.I. go to, and return directly from, the listed location. The C.I. upon returning, handed your affiant an amount of Crack Cocaine. The C.I. is a past user of Crack Cocaine and can readily identify it by sight. The C.I. advised your affiant that while the C.I. was at the residence, the C.I. purchased the Cocaine from the listed suspect. The C.I. was advised to come back anytime to purchase more Cocaine. Your affiant checked the C.I. for any contraband, after none were found, dismissed the C.I. and returned to the office. Your affiant later determined the purchased crack to test positive for cocaine content.

The Thomases claim that Williams knowingly swore to false, material information in his affidavit in support of the search warrant. They point to the following statements in the affidavit: (1) the officers and the C.I. proceeded to 5818 Hirsch; (2) Williams observed the C.I. go to, and return directly from, the listed location; and (3) the C.I. was at the residence. They contend that these statements were false and that Williams knew as much because (1) 5818 Hirsch Road did not exist; (2) Williams did not observe his C.I. go to any particular address or any particular door because his view was obstructed; and (3) Williams knew that the C.I. did not enter any residence and was not in front of any one particular address. The Thomases submit that these alleged misrepresentations were material because without them the affidavit would be facially insufficient to establish probable cause.

No. 16-20783

In evaluating a qualified immunity defense, this court "considers only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017). "Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued." *Maryland v. Garrison*, 480 U.S. 79, 85 (1987) The Thomases rely only on observations that Williams made during the course of executing the warrant, not facts Williams was actually aware of when he submitted his probable cause affidavit to the judge.[2] Because the Thomases do not present any evidence that Williams knew the statements were false or acted with reckless disregard for the truth *at the time he swore the affidavit*, the district court properly held that Williams was entitled to qualified immunity.

### III

The Thomases argue that Williams violated the Fourth Amendment by entering their home without a warrant. The mistaken execution of a valid search warrant on the wrong premises does not automatically violate the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *Garrison*, 480 U.S. at 88. The validity of the execution "depends on whether the officers' failure to realize the [inaccuracy] of the warrant was objectively understandable and reasonable." *Garrison*, 480 U.S. at 88.

In *Maryland v. Garrison*, police officers executed a search warrant for a third-floor apartment only to discover after the search that the premises contained two apartments instead of one. *Garrison*, 480 U.S. at 80. The Supreme Court upheld the search on the basis that the officers' mistake was reasonable in light of the information available to them at the time of the

---

[2] In its discussion of the *Franks* claim, the dissent does not address the legally-permitted negligence, or that that Williams is protected for any mistaken reliance on the C.I. Williams observed the C.I. go toward the apartment building and was informed that the C.I. purchased narcotics from the apartment. This fails to show he knowingly swore to false information to overcome qualified immunity.

search. *Id.* at 88-89. The Court "recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id.* at 87.

Here, Williams obtained a warrant to search 5818 Hirsch Road, which he described in the probable cause affidavit as "located in the far southeast corner" of "[t]he duplexes located in the 5800 block of Hirsch." Williams executed the warrant at "the far right apartment described by the C.I." He admitted that he "recognized the difference in the address in the probable cause affidavit and search warrant to that over the door of the subject apartment." As indicated in the "Investigative Report" prepared in response to the Thomases claims, Williams told the Internal Affairs Division that the differing address numbers "did raise a suspicion that something may be wrong." However, even though the address was not 5818 Hirsch Road, Williams stated in his affidavit submitted in support of his motion for summary judgment that he thought "[t]he apartment's location . . . was correctly and accurately described by the long-time reliable and trustworthy C.I."

The Thomases thus presented evidence that Williams had a "suspicion that something may be wrong" when he noticed the differing address numbers.[3] But, the Thomases still failed to show that it was objectively unreasonable under clearly established law for Williams to execute a search warrant at their residence. *Garrison*, 480 U.S. at 88 (finding officers' search valid even when warrant was overly broad because the warrant was based on objective facts available to officers). Williams relied on the C.I.'s description of

---

[3] The Thomases also presented evidence that Williams concluded that 5816 Hirsch Road was the wrong location *after* he questioned Ms. Thomas. But this evidence is not relevant to whether Williams knew that 5816 Hirsch Road was the wrong location at the time he entered the residence.

9

the location of the apartment in executing the warrant. "[W]e must judge the constitutionality of [Williams's] conduct in light of the information available to [him] at the time [he] acted." *Garrison*, 480 U.S. at 85. And the officers are entitled to "some latitude for honest mistakes." *Id.* at 87. Williams was neither "plainly incompetent" nor "knowingly violat[ing] the law" when he executed the warrant based on the locational description provided by a C.I. whom he knew and thought was reliable. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Hunt v. Tomplait*, 301 F. App'x 355, 359 (5th Cir. 2008) ("[L]aw enforcement officers are generally granted qualified immunity if the evidence is undisputed that they merely made an honest mistake when entering the incorrect home.").[4]

As Williams did not violate any clearly established law by executing a search warrant at a residence that he thought was the location described in the search warrant, the district court appropriately found that Williams's qualified immunity defense was applicable and he did not violate the Thomases' Fourth Amendment rights by entering their home without a warrant. Even if some Fourth Amendment rights were violated, the rights were not clearly established. The prevailing law does not instruct that unintentionally executing a search warrant at the wrong location automatically violates the Fourth Amendment and precludes an officer's

---

[4] The dissent attacks this conclusion, urging that it fails to consider the evidence in the light most favorable to the Thomases. Importantly, it never mentions the burden-shifting in the qualified immunity context: plaintiffs must show that a defendant is *not* entitled to qualified immunity. *Trent*, 776 F.3d at 376; *Brown*, 623 F.3d at 253.

The dissent also would have this court place an unrealistic burden on police officers that would essentially void well-established law that officers should not be liable for honest mistakes. Its position would force officers to act only upon completely vetted information; it is no secret that a main tenet of an officer's job is to act and react, in the most reasonable manner possible, while circumstances are rapidly unfolding in real time. To provide otherwise would allow no leeway in an officer's judgment—leeway explicitly provided for under the qualified immunity doctrine—and would also place the public's safety in jeopardy.

qualified immunity defense. Accordingly, Williams could not have been "plainly incompetent" or "knowingly violat[ing] the law." *Malley*, 475 U.S. at 341.

## IV

Finally, the Thomases argue that Williams violated the Fourth Amendment by remaining in their home for an unreasonable period of time. The Supreme Court has "held that police officers do not necessarily violate the Fourth Amendment when they mistakenly execute a search warrant on the wrong address." *Simmons v. City of Paris, Tex.*, 378 F.3d 476, 479 (5th Cir. 2004) (citing *Garrison*, 480 U.S. at 88). The officers are, however, required to discontinue the search immediately if they realize they have entered the wrong residence. *Id.* at 479-80. Because it is a clearly established constitutional norm that officers must immediately terminate a search upon realizing it is the incorrect location, we must now determine "whether there is conflicting evidence that this constitutional rule was violated." *Id.*

After entering the Thomases' residence, the officers conducted a security sweep of the apartment for "approximately 30 to 45 seconds." Williams then spoke with Ms. Thomas for "[p]robably ten minutes." He "asked her if anybody else lived there other than" Ms. Thomas and her son, John, "if anybody else had access to her apartment," and "those type of questions." Williams testified that he questioned Ms. Thomas "because [he] still believed [the officers] were in the right location."

There is some evidence, which viewed in the light most favorable to the Thomases, that indicates Williams remained at the Thomases' residence after realizing that it was the wrong apartment. Williams testified that he "realize[d] that [he] might not have been in the right location" after "[m]aybe five minutes." He asserted in his incident report that "it became *immediately*

11

clear that [5816 Hirsch Road] was not the correct apartment" after he questioned Ms. Thomas. (Emphasis added).

However, the violation of the constitutional right hinges upon the officers conducting a *search* even after realizing they are in the wrong location. *See Simmons*, 378 F.3d at 479 (reiterating that officers are "required to discontinue the search" upon realizing they are in the wrong residence).  As the district court found, it is undisputed that Williams first conducted a sweep, which led him to decide to abort the search, and no such search was ever conducted. This protective sweep does not constitute a search, so Williams merely entering the Thomases' residence does not constitute a "search." *See Maryland v. Buie*, 494 U.S. 325, 335 (1990) ("[A] protective sweep, aimed at protecting the arresting officers, [is] not a full search of the premises . . . ."). Moreover, the record does not reflect that Williams remained in the residence to perform an unconstitutional search; he remained in the residence to explain to the Thomases what had happened and to ask questions about the suspect. It was not objectively unreasonable for Williams to conduct a protective sweep and remain in the Thomases' home to explain the circumstances under which the officers inadvertently entered their home. Accordingly, because Williams did not perform a search after realizing he was at the wrong location, Williams did not violate any clearly established constitutional law. *See Simmons*, 378 F.3d at 479-80.[5] The district court, again, properly granted Williams qualified immunity on this issue.

---

[5] The dissent urges that Williams's remaining in the residence violated clearly established law under *Simmons*, 378 F.3d at 481. To overcome qualified immunity, the Thomases must prove Williams did not mistakenly remain in the residence, but, rather, violated a clearly established right through remaining in the apartment to explain his presence. The facts here, however, do not support such a conclusion. Not only did Ms. Thomas tell Williams he could look around her home, but she also does not contend that Williams remained in her home after a request to leave. As such, Williams remained in the home with tacit permission and only stayed long enough to explain his presence.

No. 16-20783

**V**

In their briefs on appeal, the Thomases also argue that there was no evidence that the C.I. was reliable. They also argue that Williams's decision not to physically corroborate the C.I.'s observations because of the residential complex's racial makeup was "facially insufficient as a matter of constitutional law." Though these contentions seem to challenge the basis for probable cause, the Thomases failed to raise these claims before the district court. Accordingly, this court need not address these claims. *See, e.g.*, *In re Paige*, 610 F.3d 865, 871 (5th Cir. 2010).

For the forgoing reasons, the district court's grant of summary judgment in favor of Williams is AFFIRMED.

No. 16-20783

JAMES L. DENNIS, Circuit Judge, dissenting:

In *Tolan v. Cotton*, 134 S. Ct. 1861 (2014), the Supreme Court took the unusual step of granting certiorari simply to correct this court's misapplication of the summary judgment standard.  The Supreme Court then unanimously and summarily vacated this court's affirmance of summary judgment to a defendant-officer on the basis of qualified immunity. *Tolan*, 134 S. Ct. at 1868–69.  The Court stated, "[T]he Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to [the nonmovant] with respect to the central facts of this case" and "fail[ed] to credit evidence that contradicted some of its key factual conclusions," and thereby "improperly 'weighed the evidence' and resolved disputed issues in favor of the moving party." *Id.* at 1866.

Statistically speaking, it is highly unlikely that the Supreme Court would repeat this strong remedy in the instant case, but the majority appears bent on providing a very good candidate for this course of action.  Because the majority opinion fails to view the evidence in the light most favorable to the nonmovant, fails to credit evidence that contradicts its key factual conclusions, and makes additional serious legal errors, I must respectfully dissent.

## I

The Thomases assert that Officer Williams violated their rights under the Fourth Amendment by searching their home without a valid warrant. They advance three basic claims that Williams's conduct violated their clearly established rights and that he is therefore liable in an action under 28 U.S.C. § 1983.  First, the Thomases assert that Williams knowingly swore to false information in his affidavit in support of a search warrant.  Second, they claim that he executed the search warrant in their home even though he knew prior to entering that he was at the wrong location.  Third, the Thomases argue in

14

the alternative that, even if Williams did not suspect that he was in the wrong location at the time he entered their residence, he unlawfully remained in their residence after he realized that he was in the wrong place. As discussed below, I would reverse the district court's grant of summary judgment in favor of Williams on all three claims.

## A.    Williams's Inclusion of Material Misrepresentations in His Warrant Affidavit

As the majority opinion correctly sets out, it is clearly established that, under *Franks v. Delaware*, 438 U.S. 154, 171 (1978), "an officer is liable for swearing to false information in an affidavit in support of a search warrant, provided that: (1) the affiant knew the information was false or [acted with] reckless disregard for the truth; and (2) the warrant would not establish probable cause without the false information." *Hart v. O'Brien*, 127 F.3d 424, 442 (5th Cir. 1997) (citing *Franks*, 438 U.S. at 171).

The Thomases claim that Williams knowingly swore to false, material information in his affidavit in support of a search warrant. They point to the following statements in the affidavit: (1) the officers and the C.I. "proceeded to 5818 Hirsch"; (2) Williams "observed the C.I. go to, and return directly from, the listed location"; and (3) "the C.I. was at the residence." They contend that these statements were false and that Williams knew as much. They argue that these alleged misrepresentations were material because without them the affidavit would be facially insufficient to establish probable cause to search any residence.

The majority opinion responds to these arguments only by stating, "The Thomases rely only on observations that Williams made during the course of executing the warrant, not facts Williams was actually aware of when he submitted his probable cause affidavit to the judge." Op. at 8. That is patently

15

untrue.  As set forth below, at least two of the three statements to which the Thomases point in Williams's affidavit were false, and record evidence suggests that Williams knew that they were false at the time he submitted his affidavit.

First, the officers and the C.I. did not "proceed to 5818 Hirsch," nor did they proceed to any particular address.  Instead, according to Williams's own account, the officers "took [the] C.I. to the complex in the 5000 block of Hirsch [Road]" and the informant was "looking for suspect Nash in the common areas." Second, Williams did not observe the C.I. "go to, and return directly from, the listed location," i.e. 5818 Hirsch Road, nor did he observe the C.I. "go to, and return directly from," any particular address.  Instead, according to Williams's own deposition testimony, he observed the C.I. in the "general immediate area" of the building in which he thought unit 5818 was located, but in which he knew that another address was also located.[1]

Williams's misrepresentations were also material.  Together, his misstatements suggested both that the officers and the C.I. had planned to make a purchase at the particular address Williams wished to search and that Williams observed the C.I. going to, and returning directly from, that address. Without these misstatements, the warrant affidavit states only that the C.I. purchased drugs while outside of a "residence."  The majority opinion itself

---

[1] The majority opinion responds that "Williams observed the C.I. go toward the apartment building and was informed that the C.I. purchased narcotics from the apartment" and that "[t]his fails to show that he knowingly swore to false information."  Op. at 8 n.2.  But these observations do not bear upon Williams's misrepresentations—that the officers and C.I. intentionally targeted the listed apartment and that he saw the C.I. "go to, and return directly from," that apartment—and the majority opinion does not endeavor to explain how they might affect the analysis.

recognizes that such facts would constitute a "dirty buy" that would not give rise to probable cause.  Op. at 2.

The foregoing establishes, at the very least, a genuine dispute as to whether misstatements in Williams's affidavit violated clearly established law under *Franks* and *Hart*.  *See Franks*, 438 U.S. at 171; *Hart*, 127 F.3d at 442. The majority opinion avoids this conclusion only by ignoring both the evidence in the record and the Thomases' arguments.  I would reverse the district court's grant of summary judgment for Williams on this claim.

## B.     Williams's Initial Entry into the Thomases' Residence

The Thomases argue that Williams violated the Fourth Amendment by conducting a search of their home without a valid warrant.  They emphasize that the warrant Williams obtained authorized the search of 5818 Hirsch Road, that Williams knew, before executing the search, that the address he was about to enter was 5816 Hirsch Road, and that he, at the very least, suspected that something was wrong.  The majority opinion asserts that Williams merely relied on the C.I.'s description of the location of the relevant apartment and therefore simply made an "honest mistake."  Here, too, the majority opinion reaches this conclusion only by ignoring record evidence and improperly viewing the evidence that it does consider in the light most favorable to the movant.

The Supreme Court has clearly established that officers must terminate a search as soon as they are on notice of the risk that they are in the wrong location.  In *Maryland v. Garrison*, 480 U.S. 79, 80 (1987), officers had a warrant to search the third floor premises.  The officers did not know that the third floor had two apartments until after they began their search, by which time they had already discovered contraband in the erroneously-searched apartment.  *Id.*  The Court determined that the officers made an honest

15

mistake and that the search of the wrong apartment was therefore valid. *See id.* at 86–88. In so concluding, the Court stated, "[A]s the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they . . . were put on notice of *the risk* that they might be in a unit erroneously included within the terms of the warrant." *Id.* at 87 (emphasis added); *see also Sampson v. Reg'l Controlled Substance Apprehension Program*, No. 94-40525, 1995 WL 84186 at *3 (5th Cir. Feb. 13, 1995) (unpublished) (referring to this statement as "the rule of *Garrison*").[2]

The rule established in *Garrison* applies to specific factual circumstances and provides every reasonable officer with fair notice of what they may not do—if they are on notice of the risk that they might search a location erroneously designated by the warrant, they may not conduct the search. This court has applied this rule as clearly established law, holding that officers were not entitled to qualified immunity because they did not discontinue their search despite being "on notice of the risk that they might search the wrong residence." *Sampson*, 1995 WL 84186 at *3.

Here, there is evidence in the record suggesting that Williams was not only on notice of the risk that he was about to search the wrong residence but that he also *knew* that the officers had the wrong apartment before entering it. In his original incident report, Williams stated that, after the officers pried open the burglar bars, they waited for Ms. Thomas to open the door and at that time noticed the discrepancy in the address. Williams then stated in his report:

> Taking this into consideration as Mrs. Thomas opened the door I questioned her about who was in the apartment currently and who resided at the apartment. *It became immediately clear that this*

---

[2] Under Fifth Circuit Rule 47.5.3, "[u]npublished opinions issued before January 1, 1996, are precedent."

*was not the correct apartment and the warrant was aborted and not executed.*

(Emphasis added). Williams's original, incident-report version of the events is supported by the statement of Officer Gregory Green to the Internal Affairs Division. Green stated: "After the burglar bars were open, Ms. Thomas opened the front door of the residence. I do not recall what Officer Williams said, but he gave some indication that we were at the wrong location."

No one can both view this evidence in the light most favorable to the Thomases and hold, as the majority opinion does, that there is no genuine dispute as to whether Williams knew that the officers were in the wrong location *before* he entered the Thomases' apartment. And so, the majority opinion just ignores this evidence and does not address it as it relates to this claim.[3]

Moreover, as previously discussed, Williams's conduct would have violated the rule that was clearly established in *Garrison* and *Sampson*, even if he only suspected that the Thomases' residence was the wrong location before he entered it. As the majority opinion acknowledges, Williams told the Internal Affairs Division that the differing address numbers "did raise a suspicion that something may be wrong." But the majority opinion still maintains that his conduct did not violate clearly established law, despite the clear instruction of Fifth Circuit and Supreme Court precedent that police may

---

[3] The majority opinion faults this dissent for not mentioning "the burden-shifting in the qualified-immunity context," pursuant to which "plaintiffs must show that a defendant is *not* entitled to qualified immunity." Op. at 10 n.4. It is, of course, the Thomases' burden to show that Williams's conduct violated their clearly established rights. They have carried their burden by providing the opposing summary-judgment evidence discussed above, which the majority opinion ignores. The majority opinion's invocation of "burden-shifting" as if it modifies the well-established rule that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan*, 134 S. Ct. at 1866, is emblematic of the majority opinion's misapprehension of the summary judgment standard.

not search a location if they are on notice of the risk that they are in the wrong location.

As previously discussed, the summary judgment evidence in this case suggests that Williams was not only on notice of the risk that he was about to enter the wrong apartment, but that he also affirmatively knew that to be the case. Such conduct indisputably violates the rules that were clearly established in *Garrison* and *Sampson*. I would therefore reverse the district court's grant of summary judgment for Williams as to this claim.

## C.    Williams's Remaining in the Residence

"Qualified immunity does not provide a safe harbor for police to remain in a residence after they are aware that they have entered the wrong residence by mistake." *Simmons v. City of Paris*, 378 F.3d 476, 481 (5th Cir. 2004). "A decision by law enforcement officers to remain in a residence after they realize they are in the wrong house crosses the line between a reasonable mistake and affirmative misconduct that traditionally sets the boundaries of qualified immunity." *Id.*

The Thomases argue that, even if Williams did not suspect that he was in the wrong location at the time he entered their residence, he violated their clearly established Fourth Amendment rights by remaining in the apartment after he realized that he was in the wrong residence. They complain that, despite Williams's admission that he only spent one minute conducting a protective sweep and that it only took him five minutes to determine that he was in the wrong house, he nonetheless remained in their home for several more minutes, during which he explained his entry to them, questioned them, and told them that someone else could have a key to their home.

Williams does not dispute that he remained in the residence and continued to speak with and question Ms. Thomas after he determined that he

15

was in the wrong location. At his deposition, he stated that it took him "maybe five minutes" to realize that he was in the wrong location—during this time he conducted a one-minute "sweep" of the residence and began talking to Ms. Thomas. Williams also stated that he spoke to Ms. Thomas for approximately ten minutes. Thus, Williams's deposition testimony suggests that he remained in the residence for approximately six minutes after he realized that he was in the wrong location. Importantly, Williams does not contend in his brief on appeal that he had the Thomases' consent to remain in their residence.[4]

Considering the evidence in the light most favorable to the Thomases, Williams's conduct violated their right not to have police remain in their home after determining that it was not the right location. This right was clearly established by this court's holding in *Simmons*, 378 F.3d at 481, that police may not "remain in a residence" after they realize that they are in the wrong home.

The majority opinion suggests that an officer does not violate the Fourth Amendment by remaining in a home after realizing that he is in the wrong place unless he continues to actively "search" the home. Op. at 11–12. But, in announcing the governing legal rule, the *Simmons* court stated, twice, that police may not "*remain in* a residence" after they realize that they are in the

---

[4] William stated in an affidavit in support of his motion for summary judgment that Ms. Thomas told the officers they could "[g]o ahead and look." The majority opinion suggests that this statement, along with the fact the Ms. Thomas did not affirmatively ask Williams to leave her home, constituted "tacit permission" for him to remain in the residence. Op. at 13 n.5. However, the majority opinion neglects to note that Ms. Thomas's statement to Williams was in response to his assertion that the officers had a warrant to search her apartment and that she, unlike Williams, was not aware that the officers had entered the wrong residence. Understandably, then, Williams does not contend that Ms. Thomas consented to his continued presence in her home. *See United States v. Lopez*, 911 F.2d 1006, 1010 (5th Cir. 1990) ("[C]onsent must be given voluntarily and not simply in acquiescence to a claim of lawful authority").

15

No. 16-20783

wrong location.   378 F.3d at 481 (emphasis added).  A physical intrusion into a person's home is a search under the Fourth Amendment.  *Florida v. Jardines*, 569 U.S. 1, 5 (2013).  That physical intrusion does not end merely because the officers are no longer actively searching the home.[5]

This court in *Simmons* clearly established precisely what it said: that police may not "remain in a residence" after they realize that they are in the wrong location.  378 F.3d at 481.  There is therefore, at the very least, a genuine dispute as to whether Williams's decision to remain in the Thomases' residence to question them after he realized that he was in the wrong place violated clearly established law under *Simmons*.  Accordingly, I would reverse the district court's summary judgment dismissal of this claim.

## II

I close where I began: in affirming the district court's summary judgment dismissal of the Thomases' claims, the majority opinion fails to view the evidence in the light most favorable to the nonmovants with respect to the central facts of this case, fails to credit evidence that contradicts its key factual conclusions, improperly weighs the evidence and resolves disputed issues in favor of the moving party, and makes serious legal errors regarding the scope of the Fourth Amendment.  I respectfully dissent.

---

[5] The majority opinion's assertion that "a protective sweep does not constitute a search," Op. at 11, is utterly baseless, and it is most unfortunate that an opinion of this court would include such a statement.  In support of the proposition that a "sweep" is not a search for purposes of the Fourth Amendment, the majority opinion misrepresents language from *Maryland v. Buie*, 494 U.S. 325, 335 (1990).  In *Buie*, the Supreme Court cautioned that a justifiable warrantless sweep of a home incident to arrest "is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found."  *Id.* at 335.  However, in authorizing warrantless security sweeps incident to arrest under certain circumstances, the Court was very clear that such a sweep does in fact constitute a "search" for purposes of the Fourth Amendment.  *See id.* at 336 ("The type of *search* we authorize today is far removed from the 'top-to-bottom' search involved in *Chimel*." (emphasis added)).

15