# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 11, 2021

Lyle W. Cayce
Clerk

No. 19-30019

Larce Spikes,

*Plaintiff—Appellee*,

*versus*

Casey McVea, Doctor; Lesley Wheat, Nurse; Paula Stringer, Nurse; Wendy Seal, Nurse; R. Bowman, Nurse,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CV-8164

Before Higginbotham, Smith, and Dennis, *Circuit Judges*.

Patrick E. Higginbotham, *Circuit Judge*:

We are asked today if confessed malpractice in medical treatment insulates Defendants from a finding of deliberate indifference. The district court determined that there was enough evidence to conclude that Defendants' conduct went beyond malpractice, rising to the level of an Eighth Amendment violation. We affirm.

**I**

Spikes, a former inmate, suffered an injury to his right hip while incarcerated at the Rayburn Correctional Center in Angie, Louisiana. He presented to the infirmary in a wheelchair, complaining of extreme pain and inability to walk. Medical staff ordered ibuprofen and a muscle rub to treat what they perceived to be a muscle strain.

Spikes returned to the infirmary five more times over the next six weeks, each time complaining of intense pain and inability to walk, stand on, or bend his right leg. Each time he was given ibuprofen and muscle rub. Although this course of treatment did not improve Spikes's pain or ability to walk, neither his nurses nor physician reassessed their diagnosis—despite his physician's concession that lost functionality would be indicative of a fracture and that a muscle strain would begin to improve in week two. Medical staff continued their cursory treatment for six weeks, without ordering any imaging, even though x-ray equipment was immediately at hand. When finally ordered, it disclosed a serious fracture requiring immediate transfer to University Medical Center New Orleans for surgery.

Spikes sued his nurses and his physician under 42 U.S.C. § 1983, alleging they were deliberately indifferent to his medical needs in violation of the Eighth Amendment. The district court denied the defendants' motion for summary judgment, finding that, at that juncture, they were not entitled to qualified immunity. On appeal, they urge there was no constitutional violation, that, at most, they misdiagnosed Spikes, a contention that steps past resolution of questions of fact. There were no changes in Spikes's condition from his first trip to the infirmary to the taking of an x-ray, and a jury could conclude that Spikes's inability to walk or stand cannot be squared with the treatment adhered to for six weeks. That is, Spikes has produced sufficient evidence for a jury to find that medical personnel knew their initial diagnosis of a strain was wrong, and that in persisting in their treatment, they

were deliberately indifferent to the risk of leaving a fractured hip untreated, conduct violative of the Eighth Amendment.

## II

## A

Inmates at the Rayburn Correctional Center are permitted to make a request for medical care during a regular sick call, from 6:00 p.m. to 6:30 p.m. on Sunday through Thursday evenings. Inmates may also "self-declare sick calls" for emergency conditions that cannot wait. When an inmate goes to the infirmary for sick call, he is initially examined by one of the facility's nurses. Nurses assess the patient and may deliver treatment in accordance with the physician's standing orders—prewritten orders authorizing certain treatment for routine medical issues. The nurses document the patient's complaint, as well as their assessment and treatment of the patient, in a Health Care Request Form. These notes remain with the patient's chart to be pulled on his subsequent visits. Each is also reviewed by the doctor on the morning of the following business day. When the doctor reviews the nurse's note, he may determine that the patient should be seen by him in either an emergent, routine, or urgent call out. However, if a nurse perceives that a patient is having a life-threatening emergency, she can call the doctor at any time for immediate assistance.

Dr. Casey McVea, who served as Medical Director at Rayburn from 2013 to 2016, testified that he relied heavily on nurses' assessments and recommendations to determine when a patient should be seen. As the sole practitioner in the facility from 2015 to 2016, Dr. McVea further testified that he was only able to see a patient immediately on an emergent call out if the patient presented with an unstable condition, like a heart attack or stroke. Urgent call outs for obvious ailments like a broken leg or very high blood pressure were seen by Dr. McVea within one to four weeks. Patients ordered for routine call outs in less serious situations were typically seen by Dr. McVea within four to eight weeks.

Dr. McVea testified that he might change a patient's priority for a call out if something changed in their assessment that warranted faster review. Similarly, nurses at Rayburn testified that they would alert Dr. McVea to patients that needed to be seen more urgently than their scheduled call out by calling him or recommending it in their note. Nurses could also call the doctor for authorization to order x-rays if needed.

Against this backdrop, on June 30, 2016, after lifting weights at Rayburn, Spikes complained of a sharp pain in his hip and groin area. Spikes testified that he could no longer move his right leg or walk; that he declared an emergency sick call and went to the infirmary in a wheelchair, where he was seen by Nurse Paula Stringer. Spikes further testified that he told Nurse Stringer that his leg had suddenly begun "killing" him after his workout and he could no longer walk. In her note, Nurse Stringer documented that Spikes complained of a "pulled muscle in R groin" and assessed him with a "muscle strain."[1] In accordance with Dr. McVea's standing orders, Nurse Stringer ordered an analgesic balm for Spikes to rub on his hip area and gave him ibuprofen and ice. On July 5, 2016, Dr. McVea reviewed Nurse Stringer's note and signed off on her treatment plan.[2]

Also on July 5, 2016, Spikes filed another emergency sick call due to his continuing pain, which now extended to his lateral thigh. Still unable to walk, Spikes arrived in a wheelchair, complaining of increased pain, despite ibuprofen and muscle rubs for five days. When asked to weigh himself, he testified that he "dragged [himself] to the weight" and "jumped up there on one leg." Yet, in her note, Nurse Stringer wrote that Spikes walked to the scale without assistance with a full range of motion in his right lower

---

[1] Spikes alleges that Nurse Stringer suggested that he had "pulled a muscle"—not him.

[2] Due to Dr. McVea's weekend and holiday schedule, he did not review Nurse Stringer's note for five days.

extremity.[3] She again assessed Spikes with a muscle strain and ordered continued treatment of ibuprofen and a muscle rub. She did not refer him to be seen by Dr. McVea. The next day, Dr. McVea reviewed Nurse Stringer's note, including the entry that Spikes walked to the scale, and ordered that Spikes's current treatment be continued with an increase in ibuprofen from two hundred to four hundred milligrams, three times daily for three months.

On the same day, July 6, 2016, Spikes again filed emergency sick call, again requiring a wheelchair to get to the infirmary, where he saw Nurse Cindy Wallace.[4] In her note, contrary to earlier notes, Nurse Wallace documented that Spikes arrived via wheelchair, could not walk, and described pain in his right hip radiating down to his right knee. She in turn discussed this sick call with Dr. McVea, but he continued the ibuprofen and muscle rub. He did order bottom-bunk assignment, access to crutches for seven days, and that Spikes later be seen in a routine call out.

Eight days later, on July 14, 2016, Nurse Robin Bowman saw Spikes on a routine sick call. Again, in her note, Nurse Bowman reported that Spikes arrived in a wheelchair, complained of severe pain, and stated he could not stand on or bend his right leg. Nurse Bowman documented possible swelling to Spikes's hip, and he reported increased pain when she pressed on his hip during a physical examination. Noting that this was Spikes's fourth sick call for the same complaint, Nurse Bowman continued treatment of ibuprofen and balm. She also ordered a routine call out with Dr. McVea and that he be placed for five days on no-duty status with a bottom-bunk assignment and continued access to his wheelchair. Dr. McVea reviewed Nurse Bowman's note on July 18, 2016.

---

[3] She testified that she could not recall from her notes how she reached that conclusion.

[4] Appellants note that pleadings in the district court inadvertently referred to Nurse Cindy Wallace as Nurse "Cindy Williams."

The next day, Spikes filed another routine sick call and was seen again by Nurse Bowman. Her note again reflected that Spikes arrived to the infirmary in a wheelchair and requested that his no-duty status be extended due to his pain and inability to stand on or bend his leg. There were no changes in Spikes's treatment, and Nurse Bowman noted that a routine call out was already scheduled with Dr. McVea. Dr. McVea reviewed the chart the following day, July 20, 2016, and confirmed that an appointment was already scheduled.

That same day, Spikes made yet another emergency sick call and was seen by Nurse Lesley Wheat. He testified that his condition was unchanged. Nurse Wheat documented that Spikes again arrived in a wheelchair complaining of right groin pain. She noted Spikes's frequent visits to the infirmary and offered him crutches with the advice not to participate in sports or lifting. On reviewing his chart, Dr. McVea removed him from no-duty status, putting him on regular duty with a note that he could continue to use his crutches for the next week.

The same day, still ignoring his inability to walk, Nurse Wheat filed a disciplinary report against Spikes for making a sixth visit to the infirmary for a "complaint [that had] been addressed," resulting in lost yard-time privileges for a month. Spikes asserts that taking his yard-time privileges away effectively prevented him from continuing to seek medical care through the sick call system, which had the practical effect of allowing his nurses and physician to avoid treating him for three of the six weeks he unnecessarily suffered.

On August 11, 2016, Spikes was seen at a routine doctor call out by Dr. McVea. Spikes again reported that he could not stand on or bend his leg. Dr. McVea ordered an x-ray for the same day and ordered Spikes placed on limited-duty status, with assignment to a bottom bunk, limited lifting, and crutches. When Spikes's x-ray found a fractured right hip, he was ordered transferred to University Medical Center New Orleans (UMC). On August

15, 2016, doctors at UMC performed an open reduction surgery. Spikes alleges that the bones in his hip began healing incorrectly due to the delay in his treatment, forcing his surgeon to refracture his hip in order to properly complete the surgery.

**B**

On August 23, 2017, Spikes brought three § 1983 claims and a state law claim against Dr. McVea and Nurses Stringer, Bowman, and Wheat, each in their individual capacities.[5] In his § 1983 claims, Spikes alleged that his Eighth Amendment right to be free from cruel and unusual punishment was violated because: (1) Dr. McVea established unconstitutional procedures and policies related to inmate access to medical care; (2) Dr. McVea and Nurse Wheat failed to train and supervise their subordinates; (3) and each defendant was deliberately indifferent to his medical needs before and after his surgery.[6] Spikes also brought state law claims against his nurses for intentional infliction of emotional distress.[7]

Defendants moved to dismiss these claims under Rule 12(b)(6), asserting qualified immunity. The district court denied the motion. The defendants then moved to dismiss Spikes's state law claims as barred by the Eleventh Amendment. The district court agreed and dismissed these claims with prejudice.[8]

After extensive discovery, Defendants moved for summary judgment based on qualified immunity as to Spikes's claims that they were deliberately

---

[5] Spikes also sued Nurse Wendy Seal, but the district court dismissed each of his claims against her. These rulings are not challenged on appeal.

[6] Spikes's complaint also alleged that Defendants violated his Fifth Amendment rights, but he later waived those claims in his opposition to Defendants' motion to dismiss. The district court subsequently dismissed Spikes's Fifth Amendment claims.

[7] *See* LA. CIV. CODE art. 2315.

[8] The district court rejected Defendants' additional argument that Spikes's claims based on events occurring before August 23, 2016, had prescribed.

indifferent to his preoperative and postoperative medical needs.[9] The district court granted summary judgment as to Spikes's postoperative claims but denied summary judgment as to his preoperative claims. The court further noted that Spikes's claims against Dr. McVea for promulgating unconstitutional policies and his claims against Dr. McVea and Nurse Wheat for failing to supervise and train their subordinates remained, as neither official asserted qualified immunity as to them.

Defendants then filed this interlocutory appeal. The only issue before us is whether Defendants are entitled to qualified immunity as to Spikes's claims that they were deliberately indifferent to his preoperative medical needs.

## III

We may review a denial of qualified immunity under the collateral order doctrine,[10] with review limited to "the materiality of factual disputes the district court determined were genuine."[11] "[W]e lack jurisdiction to resolve the genuineness of any factual disputes and consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment."[12] "Like the district court, we must view the facts and draw reasonable inferences in the light most favorable to the plaintiff and ask

---

[9] Defendants also reasserted their prescription defense, which the district court again rejected.

[10] *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc).

[11] *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc).

[12] *Id.* (alteration in original) (internal quotation marks omitted) *(quoting Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015)).

whether the defendant would be entitled to qualified immunity on those facts."[13] Within this narrow inquiry, review is de novo.[14]

## IV

Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[15] Determining whether an officer is entitled to qualified immunity requires a two-step inquiry. First, "we ask whether the officer's alleged conduct has violated a federal right."[16] Second, "we ask whether the right in question was clearly established at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct."[17]

Spikes contends that Defendants violated clearly established law by acting with deliberate indifference to his medical needs. The Eighth Amendment's prohibition against cruel and unusual punishment obligates the government "to provide medical care for those whom it is punishing by incarceration" because the failure to do so would "result in pain and suffering which no one suggests would serve any penological purpose."[18] Finding a violation of the Eighth Amendment's prohibition against cruel and unusual punishment also requires a two-step inquiry. First, Spikes must show that he was exposed to a "substantial risk of serious harm."[19] Second, he must show that "prison officials acted or failed to act with deliberate

---

[13] *Id.*

[14] *Id.*

[15] *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

[16] *Cole*, 935 F.3d at 451.

[17] *Id.* (internal quotation marks and citation omitted).

[18] *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

[19] *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006).

indifference to that risk."[20] Defendants only dispute Spikes's contention that they acted with deliberate indifference.[21]

In *Farmer v. Brennan*,[22] the Supreme Court made clear that the test for deliberate indifference is "subjective recklessness," "permit[ting] a finding of recklessness only when a person disregards a risk of harm of which he is aware."[23] Disregard is evidenced by a prison official's failure to "respond[] reasonably" to a known risk.[24] Therefore, a prison official acts or fails to act with deliberate indifference "only if (A) he knows that inmates face a substantial risk of serious bodily harm and (B) he disregards that risk by failing to take reasonable measures to abate it."[25]

Evidence of unsuccessful medical treatments, acts of negligence, neglect, or medical malpractice do not rise to the level of deliberate indifference.[26] Nor does "mere disagreement with the treatment provided."[27] Instead, Spikes must show that officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[28] Such disregard may be evidenced by a medical professional's decision to administer "easier and less efficacious treatment"

---

[20] *Id.* at 345–46.

[21] Defendants do not challenge Spikes's contention that his fractured hip posed a substantial health risk.

[22] 511 U.S. 825 (1994).

[23] *Id.* at 837, 839–40.

[24] *Id.* at 844–45.

[25] *Gobert*, 463 F.3d at 346 (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 847).

[26] *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

[27] *Easter v. Powell*, 467 F.3d 459,464 (5th Cir. 2006) (per curiam).

[28] *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (internal quotation marks and citation omitted).

without exercising professional judgment.[29] So too may delays in treatment caused by non-medical reasons.[30]

## V

## A

We first consider whether Defendants were aware of a substantial health risk to Spikes. The prison officials concede that they had "subjective knowledge of [Spikes's] complaints," including his increasing pain and lack of mobility, but argue that they did not perceive a risk to Spikes beyond their mistaken belief that his complaints were the result of a muscle strain.

Although Defendants deny knowing the risk to Spikes, "a factfinder may conclude that [they] knew of a substantial risk from the very fact that the risk was obvious."[31] Accepting the facts in Spikes's favor, as we must, we conclude that a jury might find that Spikes's prolonged inability to walk and complete lack of response to treatment show that Defendants were deliberately indifferent to his obvious symptoms and unchanged condition.[32]

---

[29] *Estelle*, 429 U.S. at 104 & n.10.

[30] *See Delaughter v. Woodall*, 909 F.3d 130, 138 n.7 (5th Cir. 2018); *Hanna v. Corrections Corp. of America*, 95 F. App'x 531, 532 (5th Cir. 2004) (unpublished) (per curiam).

[31] *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."); *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (per curiam) ("Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk." (internal quotation marks and citation omitted)).

[32] *See Harris*, 198 F.3d at 159–60 (holding that prison doctor and nurses were subjectively aware of risk to inmate's health after his "urgent and repeated requests for immediate medical treatment" for his broken jaw and "complaints of excruciating pain"); *Dauzat v. Carter*, 670 F. App'x 297, 298 (5th Cir. 2016) (unpublished) (per curiam) (concluding that medical personnel's awareness of a substantial health risk could be inferred from symptoms "'so apparent that even a layman would recognize that care [was] required'" (alteration in original) (quoting *Gobert*, 463 F.3d at 345 n.12)).

In his first visit to the infirmary, Spikes arrived via wheelchair, told Nurse Stringer that his leg was "killing him" after lifting weights, and stated that he could no longer walk. In the assessment section of her note, she wrote "muscle strain." Nurse Stringer treated Spikes again five days later and learned that he was experiencing increased pain and still could not walk—despite his use of ibuprofen and muscle balm. Accepting that Nurse Stringer believed Spikes's symptoms were consistent with a muscle strain on his first trip to the infirmary, it can be inferred from the circumstances that she became aware on his second visit that his condition was more serious than her initial assessment indicated.[33] In short, a jury could find that the diagnosis of a sore muscle cannot be squared with Spikes's inability to walk or failure to respond to ibuprofen and muscle rub—a quick concession of malpractice does not insulate Defendants from accountability for an obvious danger and its knowing disregard.

Similarly, Nurses Bowman and Wheat's knowledge of a risk to Spikes beyond a pulled muscle can be inferred from the circumstances. Nurse Bowman treated Spikes two weeks after his initial injury, and then again five days later. Both times he arrived in a wheelchair, complaining of severe pain and inability to stand on or bend his leg. Reviewing Spikes's chart, Bowman was aware that Spikes had already travelled to the infirmary in a wheelchair several times before, complaining that he could no longer walk. Likewise, when Nurse Wheat treated Spikes three weeks after his initial injury, she knew that he had travelled to the infirmary five times already and his condition was unchanged. From these facts, a jury could infer that Nurses Bowman and Wheat were subjectively aware that treatment for a muscle strain had proved to be ineffective and Spikes faced a far more serious risk.[34]

---

[33] *See Harris*, 198 F.3d at 159–60.

[34] *See id.*

Finally, Dr. McVea's knowledge can also be inferred from the obviousness of Spikes's condition. After reviewing the notes submitted by each nurse and discussing Spikes's course of treatment with Nurse Wallace, Dr. McVea knew that Spikes was in severe pain, unable to walk, and unresponsive to weeks of ibuprofen and muscle rub. He acknowledged that these symptoms were inconsistent with a muscle strain, testifying that a patient's inability to walk would be indicative of a fracture and that a muscle strain would likely improve by its second week. Thus, a reasonable factfinder could similarly infer from the circumstances that Dr. McVea knew there was a substantial risk of harm to Spikes's health that was not being addressed.[35]

## B

In similar cases, we have recognized that an official is deliberately indifferent to a prisoner's serious medical need when he delays treatment with responses so cursory or minimal that they cause unnecessary suffering.[36] In *Austin*, juvenile offender John E became dehydrated while participating in

---

[35] *See id.*

[36] *See Galvan v. Calhoun Cty.*, 719 F. App'x 372, 374–75 (5th Cir. 2018) (unpublished) (per curiam) (concluding that prisoner stated deliberate indifference claim where prison officials responded to his complaints of excruciating stomach pain by offering Pepto-Bismol and a home remedy, only granting him access to a prison doctor three days later); *Rodrigue v. Grayson*, 557 F. App'x 341, 342, 346 (5th Cir. 2014) (unpublished) (per curiam); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003); *Harris*, 198 F.3d at 155, 159–60 (holding that prisoner stated deliberate indifference claim when he alleged that prison officials only performed a cursory inspection of his mouth and ignored his repeated complaints of excruciating pain for eight days after his jaw re-broke); *Ledesma v. Swartz*, No. 97-10799, 1997 WL 811746, at *1 (5th Cir. 1997) (unpublished) (per curiam) (holding that prisoner stated deliberate indifference claim by alleging that prison physician responded to prisoner's complaints of a broken jaw from a fall with nothing more than Motrin, a liquid diet, and scheduling x-rays five days later). Other circuits have also recognized that delays in necessary medical care that include cursory or grossly inadequate treatments constitute deliberate indifference. *See, e.g.*, *Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017) ("Continuing an ineffective treatment plan also may evidence deliberate indifference."); *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) ("When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.").

a one-day court-mandated boot camp conducted by the county's juvenile probation department.[37] At 3:00 p.m., he began vomiting and became unconscious.[38] The camp's officials rendered first aid and waited until 4:42 p.m. to call an ambulance.[39] Even though the officials offered minimal care, we concluded that their nearly two-hour delay in contacting competent medical professionals "r[ose] to the level of deliberate indifference."[40] Similarly, in *Rodrigue*, state prisoner Calvin Rodrigue made repeated complaints of nausea, bilious vomiting, and extreme abdominal pain.[41] His nurse responded to each of his complaints with nausea medicine and at one point an enema.[42] On the eleventh day of Rodrigue's complaints, his nurse authorized his transport to a hospital, where he was diagnosed with a ruptured appendix and hospitalized for several weeks.[43] Acknowledging that Rodrigue's nurse offered him some treatment, we affirmed the district court's determination that she disregarded Rodrigue's substantial health risk by denying him "access to a medical professional competent to diagnose and treat his condition."[44]

Like John E and Rodrigue, Spikes's obvious health risk was met with cursory treatment and delayed access to needed medical care, conduct that could rise to the level of deliberate indifference.[45] While Nurse Stringer's

---

[37] *Austin*, 328 F.3d at 206.

[38] *Id.*

[39] *Id.*

[40] *Id.* at 210.

[41] *Rodrigue*, 557 F. App'x at 342.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 343–46 (internal quotation marks and citation omitted).

[45] *See id.*; *Austin*, 328 F.3d at 210; *see also Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (en banc) ("[I]f knowing a patient faces a serious risk of appendicitis, the prison

response to Spikes's first visit to the infirmary did not rise above negligence, we cannot say the same of her response to his second. After Nurse Stringer became aware that Spikes suffered from more than a muscle strain—his inability to walk—she neither changed his treatment nor referred him to Dr. McVea. Moreover, a jury could conclude that Stringer knowingly relayed false, or at a minimum, unverified, information about Spikes's symptoms to Dr. McVea: she wrote in her note that Spikes had a full range of motion in his right lower extremity, although Spikes swears he wasn't able to walk or bend his leg at the time. Despite Spikes's worsening condition, Nurse Stringer did not record his most obvious symptoms or recommend a call out. This conduct evinces a wanton disregard for Spikes's medical needs.[46]

Similarly, Bowman, Wheat, and McVea offered Spikes only minimal treatment despite compelling evidence that he suffered a fracture. Aware that Spikes was unable to walk for weeks and repeatedly complained of excruciating pain, there is no evidence that these officials made any attempt to alter Spikes's treatment. Neither Nurses Bowman nor Wheat contacted Dr. McVea to recommend urgent care or to authorize an x-ray—although immediately at hand. Similarly, Dr. McVea never changed Spikes's priority for a call out after reviewing notes from his six sick calls. Even more callously, Nurse Wheat disciplined Spikes for continuing to request care—effectively denying him access to treatment for weeks. A jury could find that each official's insistence in a course of treatment so plainly unresponsive to

---

official gives the patient an aspirin and sends him back to his cell, a jury could find deliberate indifference even though the prisoner received some treatment.").

[46] *See Sanchez v. Oliver*, 995 F.3d 461, 474 (5th Cir. 2021) (recognizing that a failure to assess patient meaningfully might rise to level of deliberate indifference); *Dauzat*, 670 F. App'x at 298 (determining that nurse's failure to refer patient with obvious serious medical need to a physician was unreasonable).

Spikes's condition demonstrates a deliberate indifference for his serious medical need.[47]

Defendants persist that they merely "misdiagnosed" Spikes's broken hip as a pulled muscle, and thus, were not deliberately indifferent to his needs. Of course while "negligen[ce] in diagnosing" does not amount to deliberate indifference,[48] an official's failure to respond upon learning his diagnosis is incorrect does.[49] Accepting Spikes's version of the facts, despite clear evidence that his condition was far more serious than his initial assessment indicated, medical staff never revised its course of treatment. A jury may well conclude that such an unreasonable response rises to the level of deliberate indifference.[50]

Our dissenting colleague argues that we have failed to hold Spikes to his burden. Not so. We conclude that Spikes has introduced evidence showing that officials knowingly furnished treatment unresponsive to his need. Put another way: they "ignored" his inability to walk and "refused to treat" his lost mobility, permitting the inference that they "intentionally treated him incorrectly."[51] And, even if the dissent were right that Spikes's evidence does not neatly fall into these categories, we see no meaningful distinction between an official's decision to offer plainly unresponsive

---

[47] *See Austin*, 328 F.3d at 210.

[48] *Estelle*, 429 U.S. at 106.

[49] *Compare Domino*, 239 F.3d at 756 (concluding that evidence might prove doctor misdiagnosed prisoner as non-suicidal but could not show he was deliberately indifferent, as evidence failed to "support an inference that [prisoner] was so obviously suicidal that [doctor] must have known yet disregarded that risk"), *with Sanchez*, 995 F.3d at 474–75 (determining that medical professional's conduct rose to the level of deliberate indifference despite claiming mere misdiagnosis because there was evidence that professional was aware that her diagnosis was incorrect).

[50] *See Mandel*, 888 F.2d at 789 (affirming finding that medical professional acted with deliberate indifference where he "ignored repeated indications . . . that the patient's condition was far more serious than his two different diagnoses . . . suggested").

[51] *See Domino*, 239 F.3d at 756.

treatment to a prisoner and his decision to "refuse[] to treat him," "ignore[] his complaints," or "intentionally treat[] him incorrectly."[52] So, at a minimum, Spikes has introduced evidence that officials "engaged in . . . similar conduct that would clearly evince a wanton disregard for" his serious medical need.[53] This rises to the level of deliberate indifference.[54]

## C

Defendants next contend that however material factual disputes are resolved, they are entitled to qualified immunity because their actions did not violate clearly established law, given that the facts of this case are no more egregious than in *Estelle v. Gamble*. Defendants are incorrect. In *Estelle*, prisoner Gamble was diagnosed with a lower back strain and received bed rest, muscle relaxants, and pain relievers in response to his frequent complaints of pain.[55] He filed suit against the facility's medical director for failing to order imaging or pursue additional treatments.[56] Concluding that his allegations did not rise to the level of deliberate indifference, the Court ruled that Gamble failed to state a violation of the Eighth Amendment.[57]

Unlike the case before us, Gamble faltered in demonstrating that officials disregarded a *known* risk to him.[58] Other than staff's awareness of his continued complaints, Gamble made no allegation suggesting that the prison's medical personnel knew of a serious ailment untreated. He never alleged that he presented to staff with immobility due to his pain, nor did he suggest that doctors documented any physical deformity resulting from his

---

[52] *See id.*

[53] *See id.*

[54] *See id.*

[55] *Estelle*, 429 U.S. at 99–101.

[56] *See id.* at 107.

[57] *See id.* at 106–07.

[58] *See Farmer*, 511 U.S. at 835–37.

injury. By contrast, Spikes reported to the infirmary repeatedly in a wheelchair. There was documented swelling to his hip. And at all times, he was unable to walk, stand on, or bend his leg. Dr. McVea conceded these symptoms were consistent with a fracture, testifying that a muscle strain would begin to improve after a week and that a patient's inability to walk would be indicative of a break. In short, unlike Gamble, Spikes's injury rendered him immobile, a symptom so severe for so long that jurors could conclude that his nurses and physician knew that a severe fracture was the likely culprit, a reality they disregarded by offering him little more than ibuprofen for forty-two days—failures, here summing, to indifference.[59]

Defendants further assert that Spikes has failed to identify caselaw giving them notice that their conduct was unlawful. But as our above analysis shows, this Court has made clear that delays in treatment, marked by plainly unresponsive care, rise to the level of deliberate indifference.[60]   In light of these precedents, Defendants had "fair warning" that their delay in treating Spikes's fractured hip beyond the most cursory care violated his Eight Amendment rights.[61]

## VI

We affirm the district court's denial of summary judgment and remand for further proceedings consistent with this opinion.

---

[59] *See Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) ("If the symptoms plainly called for a particular medical treatment—the leg is broken, so it must be set; the person is not breathing, so CPR must be administered—a doctor's deliberate decision not to furnish the treatment might be actionable under § 1983.").

[60] *See Galvan*, 719 F. App'x at 374–75; *Rodrigue*, 557 F. App'x at  342, 346; *Austin*, 328 F.3d at 210; *Harris*, 198 F.3d at 159–60; *Ledesma*, 1997 WL 811746, at *1.

[61] *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

JERRY E. SMITH, *Circuit Judge*, dissenting:

The majority denies officials qualified immunity ("QI") in defiance of Supreme Court precedent, which clearly establishes that their actions were constitutional. Because the majority (I) defies Supreme Court precedent, (II) fails to hold Spikes to his burden, and (III) defines clearly established law based on unpublished and inapposite precedent, I respectfully dissent.

I.

The decision in *Estelle v. Gamble*, 429 U.S. 97 (1976), resolves this case, because (A) its facts are either strikingly similar to or more egregious than those here, and (B) *Gamble* isn't distinguishable in any relevant respect.

A.

Gamble, a prisoner, visited "medical personnel on 17 occasions spaning a 3-month period." *Id.* at 107. Officials "diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants[,] . . . pain relievers," and a bottom bunk. *Id.* at 107, 99. Later, when Gamble refused to work, he "was brought before the prison disciplinary committee." *Id.* at 101. As it turns out, x-rays might have revealed that Gamble had a more serious back injury. *Id.* at 107. The Court concluded that those actions constituted "[a] medical decision" and did "not represent cruel and unusual punishment." *Id.* None of those "acts or omissions [was] sufficiently harmful to evidence deliberate indifference to serious medical needs," as required to establish an Eighth Amendment violation. *Id.* at 106–08. *Gamble* exposes four flaws in the majority's rationale.

First, the majority posits that, on Spikes's second and subsequent visits, officials became deliberately indifferent, because his unchanged condition rendered them "aware that Spikes suffered from more than a muscle strain." Under the majority's theory, medical officials are permitted a single

No. 19-30019

misdiagnosis mulligan before deliberate indifference sets in.

*Gamble* rejects that theory.  For instance, Gamble visited medical personnel seventeen times in three months,[1] reporting unchanged symptoms and not receiving the proper treatment.  *Id.* at 100, 107.  Under the majority's approach, the *Gamble* officials were liable on the second, third, fourth, . . . and seventeenth visits.  But, in reality, they weren't, so the majority's theory is inconsistent with *Gamble*.  As we've made clear, "failure to diagnose, alone, does not constitute deliberate indifference."  *Gobert v. Caldwell*, 463 F.3d 339, 350 n.34 (5th Cir. 2006).

Second, the majority describes the officials' treatments of Spikes as "so cursory or minimal that they cause unnecessary suffering."  In a word, the majority—in all its post-hoc medical wisdom—deems that continued prescriptions of rest (no-duty status), muscle rub, pain relievers (ibuprofen), a wheelchair, ice, and a lower bunk, are so grossly inadequate to treat a leg injury that they constitute deliberate indifference.  That's an odd conclusion, however, because those treatments are strikingly similar to the treatments in *Gamble*.  The *Gamble* officials "diagnosed [Gamble's] injury as a lower back strain and treated it with bed rest, muscle relaxants[,] . . . pain relievers," and a lower bunk, *id.* at 107, 99—most of the same allegedly "cursory" treatments that the officials used here.

Third, the majority declares that Nurse Wheat's decision to "callously . . . discipline[] Spikes for continuing to request care" evinces deliberate indifference.  But Gamble was likewise "brought before [a] prison disciplinary committee for his refusal to work," and the Court still didn't find deliberate indifference.  *Id.* at 101, 106–07.  So discipline associated with a

---

[1] That's significantly more than Spikes's six visits "over . . . six weeks."

medical issue doesn't establish deliberate indifference.

Fourth, the majority suggests that Nurses Bowman and Wheat were deliberately indifferent, because they didn't ensure that Spikes obtained an x-ray. But *Gamble* concluded that "whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"—not deliberate indifference. *Id.* at 107. Thus, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."[2] In short, *Gamble* forecloses the majority's theory that a decision to not order an x-ray violates the Eighth Amendment.

## B.

The majority's attempts to distinguish *Gamble* based on (1) "immobility" and (2) "deformity" are misguided.

First, the majority contends that the officials here were more deliberately indifferent than those in *Gamble*, because, in contrast to Spikes, who complained that he couldn't stand, Gamble didn't report any loss of mobility. To begin, that's false. Gamble repeatedly reported his inability to work, so he did complain about mobility. *See, e.g.*, *id.* at 100. In any event, Gamble had an injured *back*—not, like Spikes, an injured *leg*. So it makes sense that, with two different injuries, the two patients might manifest differing mobility issues. It's not clear that a leg injury is *per se* more serious than a back injury.

Second, concerning deformity, the majority makes hay of the fact that Spikes experienced swelling. It's odd, however, that the proposed opinion *never mentions swelling in establishing deliberate indifference*. One would think that, if that fact were so powerful as to justify a result different from that in

---

[2] *Id.*; *accord Gobert*, 463 F.3d at 346 ("[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment." (cleaned up)).

No. 19-30019

*Gamble*, the majority would at least rely on it.

## II.

To prove the "extremely high standard"[3] of deliberate indifference, "a plaintiff must show that the defendant: (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (cleaned up). Where officials provide some form of medical treatment, it becomes relatively difficult to show that they *disregarded the risk*, because "we do not demand perfection." *Sanchez v. Oliver*, 995 F.3d 461, 473 (5th Cir. 2021). Neither "an incorrect diagnosis by prison medical personnel"[4] nor "mere disagreement with the treatment provided" is "sufficient to state a claim for deliberate indifference."[5] Thus, in those situations, we require a prisoner to "submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert*, 463 F.3d at 346 (cleaned up). The majority agrees that that accurately describes Spikes's burden.

But the officials did not (A) "refuse[] to treat [Spikes]," (B) "ignore[] his complaints," or (C) "intentionally treat[] him incorrectly." *Id.* (cleaned up).

## A.

The officials didn't "refuse[] to treat" Spikes. *Id.* (cleaned up). They

---

[3] *Gobert*, 463 F.3d at 346 (cleaned up); *accord Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).

[4] *Domino*, 239 F.3d at 756.

[5] *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (per curiam).

prescribed analgesic balm, ibuprofen, and ice. When his pain persisted, they increased his ibuprofen dosage, reduced his activity, and gave him a bottom bunk and crutches. They put him on no-duty status—meaning that he wouldn't have to work—and told him not to participate in sports or weightlifting. Perhaps those treatments were inadequate. But they don't constitute a "refus[al] to treat" Spikes. *Id.* (cleaned up). In a word, "[t]he record of extensive medical treatment" shows that the officials' conduct does not "rise[] to the level of egregious intentional conduct required to satisfy the exacting deliberate indifference standard." *Id.* at 351.

## B.

The officials didn't "ignore[] [Spikes's] complaints." *Id.* at 346 (cleaned up). Nurses considered Spikes's condition on six occasions. And Dr. McVea eventually evaluated Spikes and properly diagnosed him. Perhaps the officials should've scheduled his x-ray more quickly. But a decision not to order an x-ray doesn't constitute deliberate indifference. *Gamble*, 429 U.S. at 107. Or maybe the officials should've seen him more often or ordered better treatment. Regardless, they didn't "ignore[] [Spikes's] complaints." *Id.*

## C.

There is no evidence that the officials "intentionally treated [Spikes] incorrectly." *Gobert*, 463 F.3d at 346 (cleaned up). They repeatedly noted that they believed that Spikes had pulled a muscle. Although the majority spills much ink stretching to conclude that the officials had *knowledge* of the seriousness of Spikes's injury, it makes no attempt to assert that any official engaged in "egregious *intentional* conduct." *Id.* at 351 (emphasis added).

## III.

Even setting aside the majority's botched constitutional analysis, the

officials have asserted QI, so we must determine "whether the right in question was clearly established at the time of the alleged violation, such that the [officials were] on notice of the unlawfulness of [their] conduct." *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (en banc) (cleaned up), *cert. denied*, 141 S. Ct. 111 (2020).

The majority's sole premise on the "clearly established" prong appears to be that we have clearly established that "delays in treatment, marked by plainly unresponsive care, rise to the level of deliberate indifference." There are two problems with that statement. First, as noted above, *Gamble* dealt with a delay in treatment and medical care that was apparently unresponsive to Gamble's ailment. So that premise is *not* clearly established in light of *Gamble*. Thus, *Gamble* "squarely governs the facts here." *Mullenix v. Luna*, 577 U.S. 7, 15 (2015) (cleaned up). Even in the counterfactual world where the majority's attempts to distinguish *Gamble*—based on (1) mobility and (2) swelling—were compelling, the opinion fails to cite any cases that would put officials on notice that (1) mobility and (2) swelling are so grievously severe symptoms as to render all malpractice in light of those symptoms deliberately indifferent.

Second, the cases that the majority cites, as clearly establishing the law, are unpublished or factually inapposite. Unpublished cases "cannot clearly establish the law." *Garcia v. Blevins*, 957 F.3d 596, 601 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1058 (2021). And factually inapposite cases are insufficient to put officers "on notice [that] their conduct is unlawful." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (cleaned up).

Because the majority (1) ignores binding Supreme Court precedent, (2) fails to hold Spikes to his burden, and (3) defines clearly established law based on unpublished and inapposite precedent, I respectfully dissent.